MARÍA RODRÍGUEZ, demandante y apelada, *v.* JOSÉ MARÍA APONTE, HERNÁN APONTE y AUTORIDAD DE FUENTES FLUVIALES DE PUERTO RICO, demandados y apelantes los dos primeros.

Número 11307.

*Sometido:* 1 de marzo de 1955. *Resuelto:* 25 de octubre de 1955.

*Mario Báez García,* abogado de los apelantes; *E. Alcaraz Casablanca,* abogado de la apelada; *Gabriel Guerra Mondragón* y *Antonio M. Bird,* abogados de la Autoridad de Fuentes Fluviales.

EL JUEZ ASOCIADO SEÑOR SIFRE emitió la opinión del Tribunal.

Un joven de veinte años de edad, hijo de la demandante, del que ésta dependía, murió por electrocución al hacer contacto con la cadena que sostenía una de las sillas de un artefacto de sillas voladoras—movido por energía eléctrica—cuando entraba en ella autorizado por un boleto de admisión que compró. La madre demandó al dueño del aparato, a su agente y administrador, así como a la Autoridad de Fuentes Fluviales de Puerto Rico, en cobro de indemnización por concepto de daños y perjuicios. El Tribunal Superior, Sala de Mayagüez, pronunció sentencia, en virtud de la cual condenó a los dos primeros al pago de la suma de diez mil dólares, más las costas y quinientos dólares para honorarios de abogado, y exoneró a la Autoridad. Los demandados afectados adversamente por la sentencia apelaron de la misma.

Según las conclusiones del citado tribunal, el demandado Hernán Aponte, dueño del aparato de sillas voladoras, representado por su agente y administrador, José María

Aponte, celebró un contrato con la también demandada Autoridad de Fuentes Fluviales de Puerto Rico, para el suministro por ésta de la energía eléctrica necesaria para el funcionamiento de las sillas. La Autoridad empezó a suplirla, tomándose dicha energía eléctrica de una línea de distribución de dicha Autoridad, de doscientos veinte voltios, que terminaba en un poste, en donde fué colocado el contador, estando aquél situado a una distancia aproximada de cincuenta pies del sitio en donde estaban establecidas las sillas, a las que era conducida la corriente por alambres colocados en un cable protegido por una capa o cubierta de goma, extendido sobre la tierra, que fué unido a la línea de distribución por un empleado de la Autoridad. Sin embargo, la instalación eléctrica de las sillas voladoras la hizo uno de los apelantes. El cable que partía de la toma y todo el equipo eléctrico por donde pasaba desde allí la corriente hasta las sillas, era de la pertenencia de uno de los apelantes y estaban bajo el control de ambos. Por dicho cable y equipo, las sillas recibían energía eléctrica de 220 voltios para el motor, que era aditamento del aparato, y de 110 voltios para el alumbrado del mismo.

Toda la instalación fué inspeccionada por uno de los empleados de la Autoridad, antes de que ésta empezara a suministrar la corriente, sin que se encontrara defecto alguno, y una vez hecha la inspección y aprobada dicha instalación, procedió la Autoridad a suplir energía eléctrica, y comenzaron a funcionar las sillas voladoras—que estaban instaladas en una plazoleta a la cual tenía acceso el público, aunque para usarlas había que pagar cierta cantidad—y continuaron funcionando sin entorpecimiento de ninguna clase durante cuatro días con antelación al accidente. Éste ocurrió cuando el hijo de la demandante, que había comprado un boleto de admisión para utilizar una de las sillas, agarró la cadena que la sostenía, para entrar en ella, recibiendo "una sacudida que lo lanzó al pavimento en donde fué recogido muerto . . .", según lo expresa el tribunal a quo en sus conclusiones, de

acuerdo con una de las cuales "Las circunstancias en que ocurrió la muerte . . . permiten inferir que el 'shock' eléctrico que causó dicha muerte lo recibió el occiso al tocar o hacer contacto con la cadena que sujetaba la silla voladora que se proponía usar la noche del accidente y así lo concluímos, como cuestión de hecho, al no ser controvertida ni refutada dicha inferencia". La cadena con la que hizo contacto el hijo de la actora, según el criterio de la Sala de instancia ". . . no debe conducir normalmente corriente eléctrica alguna". Después del trágico accidente, la Autoridad inspeccionó de nuevo sus líneas, así como la instalación de los apelantes, sin que tampoco se encontrara en aquélla ninguna anormalidad.

Resolvió dicho tribunal que la prueba demostró que cuando ocurrió la muerte, las sillas voladoras estaban bajo el dominio de los demandados José María Aponte y Hernán Aponte, los apelantes, el primero como administrador del segundo, y éste como dueño de las sillas; que sucedió sin que hubiera mediado culpa alguna por parte del occiso, y que tratándose de un accidente "que en el curso ordinario de las cosas no hubiera ocurrido si dichos demandados, dueño y administrador, hubieran ejercitado el debido cuidado en el manejo y operación de dicho artefacto causante del daño, debe concluirse que . . . fueron negligentes y que dicha negligencia fué la causa directa, próxima y eficiente" de la muerte, "haciendo aplicación de la doctrina de *res ipsa loquitur*". Rehusó aplicarla a la reclamación contra la Autoridad, por razones que expondremos oportunamente.

▆ Se quejan los apelantes en el primer señalamiento de que se usara dicha doctrina con respecto a ellos, sosteniendo que no puede invocarse cuando se alegan actos específicos de negligencia. Hemos decidido lo contrario. En *Román* v. *Mueblería Central*, 72 D.P.R. 341, resolvimos que "no se aviene con la moderna tendencia de los tribunales a hacer justicia sustancial pasando por sobre aquellos tecnicismos que lo impidan, rehusar la aplicación de la doctrina de *res ipsa loquitur*, por el hecho de que el demandante haya alegado en

su demanda actos específicos de negligencia, que luego intentó, pero no pudo probar, precisamente por la forma inexplicable para él en que ocurrieron" añadiendo que "si de la prueba presentada surge la aplicabilidad de la doctrina y que por las circunstancias en que ocurrió el accidente, el demandante, en verdad no puede probar los actos específicos de negligencia que alegó, resulta claramente injusto" el no aplicarla.(¹)

■■ En vista de la naturaleza del accidente, la doctrina de *res ipsa loquitur* podía ser aplicada al caso de autos, como lo fué en cuanto se refiere a los apelantes. La muerte sobrevino sin que fuera negligente el hijo de la actora al entrar legalmente en una silla voladora de un artefacto bajo el control de los demandados Aponte, como consecuencia de un suceso que no hubiera ocurrido en el curso ordinario y normal de las cosas, de haber ejercitado aquéllos el debido cuidado en el manejo y funcionamiento de dicho artefacto, estando justificada la presunción de que acaeció por su negligencia, causa inmediata y eficiente de la muerte, presunción que no fué controvertida por prueba alguna. En *Hermida* v. *Feliciano*, 62 D.P.R. 55, dijimos que la doctrina de *res ipsa loquitur* es una regla de evidencia, que "Lo que hace es disponer que, una vez se han establecido los hechos que justifican su aplicación, el demandante está relevado de la regla general que le exige probar previamente la negligencia del demandado", surgiendo en su lugar "una presunción de negligencia, como cuestión de evidencia circunstancial, sin que medie prueba directa para ello, y el peso de continuar con la prueba es trasladado en ese momento al demandado, quien

(¹) La demandante no probó que la muerte fuera causada, según alegó, al permitir los demandados Aponte, "la extensión de alambres de alta tensión en sus artefactos y alrededor de ellos y la Autoridad de Fuentes Flúviales de Puerto Rico al tener dichos alambres extendidos por dicho lugar y conectados a dichos artefactos sin existir aviso alguno anunciando el peligro". Al presentar los demandados una moción de *nonsuit*, la actora descansó . . . en la doctrina de *res ipsa loquitur*. Bajo las circunstancias en que ocurrió el accidente, no es aventurado decir que a la demandante no le era posible probar el motivo que dió lugar a que la corriente pasara a la cadena que sostenía la silla.

debe demostrar que empleó el debido cuidado", demostración que como hemos visto, no hicieron los apelantes.

Actuaríamos caprichosamente si repudiáramos las conclusiones del tribunal sentenciador al efecto de que debía presumirse la negligencia de los apelantes por razón de dicha doctrina y cometeríamos grave injusticia si por el motivo que estos aducen, resolviéramos que le es inaplicable. El principio establecido en nuestra decisión en *Román* v. *Mueblería Central,* supra, que debe ser interpretado a la luz del propósito que con él quiere lograrse, justifica plenamente a nuestro juicio, lo que acabamos de expresar.

■■ Está desprovista de méritos la contención de los apelantes al efecto de que no puede presumirse que fueron negligentes, en vista de que la Autoridad inspeccionó la instalación eléctrica de las sillas voladoras antes de suplir la corriente eléctrica.([2])

Resolvió la Sala de instancia que la muerte había sido ocasionada por la electricidad suplida por la Autoridad, pero que no podía presumirse negligencia de su parte, bajo la doctrina de *res ipsa loquitur,* toda vez que dicha demandada no tenía control sobre el artefacto de sillas voladoras ni sobre la corriente eléctrica que circulaba por la instalación de los apelantes, "más allá del contador", decidiendo que la doctrina no era de aplicación a una empresa distribuidora de energía eléctrica, por perjuicios causados por líneas privadas, bajo el dominio del dueño, cuando la obligación de la empresa está limitada a suplir la corriente, y no se demuestra que el daño

---

([2]) Los apelantes llaman nuestra atención a la Ley núm. 42 de 17 de abril de 1935 ((1) pág. 243), que en su sec. 2, enmendando la sec. 10 de la Ley núm. 13 de 1923 ((1) pág. 191), según había sido enmendada por la Ley núm. 36 de 1932 (Leyes de 1931–32, pág. 277), provee en parte lo siguiente:

". . . Disponiéndose además que ninguna compañía de servicio público aprobará ni suministrará corriente eléctrica a ninguna instalación, reparación o trabajos eléctricos que no hubieren sido realizados por un perito electricista autorizado".

Nos referiremos de nuevo a esa legislación, al discutir el tercer señalamiento en el que se sostiene que erró la corte a quo al declarar sin lugar la demanda en cuanto a la Autoridad.

sobrevino como consecuencia de una corriente excesiva, lo que a su juicio no fué establecido por la prueba. Dijo a ese respecto que, ". . . no hay evidencia alguna de que la muerte fué causada por una corriente eléctrica de gran voltaje ni podemos presumir tal hecho en vista de la declaración del Dr. Perea de que la corriente de 110 voltios servida para el alumbrado de las sillas voladoras podía causar la muerte de un ser humano haciendo contacto con agua".

Aseveran los apelantes en el segundo apuntamiento que dicha conclusión les perjudica—por haberse exonerado a la Autoridad de responsabilidad—y sostienen que la corte a quo "se amparó para hacer ese pronunciamiento en una simple manifestación del Dr. Perea, de que la corriente eléctrica de 110 voltios era suficiente para causar la muerte de un ser humano, afirmación ésta que no excluye la posibilidad de que una corriente de mayor voltaje haya pasado por los alambres ocasionando la muerte." No estamos de acuerdo. El tribunal sentenciador resolvió, a nuestro juicio correctamente, *que no había prueba alguna de que la muerte hubiera sido ocasionada por una corriente de gran voltaje, e hizo referencia a lo declarado por el Dr. Nelson Perea, simplemente para decidir que no podía presumirse lo contrario*, en vista de que de acuerdo con lo declarado por dicho testigo, una corriente de 110 voltios—de ese voltaje, como hemos visto, era la que se suplía para el alumbrado de las sillas voladoras—"puede causar muerte de un ser humano estando en contacto con agua". [3]

Se sostiene en el tercer señalamiento que incidió en error dicho tribunal ". . . al resolver que la Autoridad . . . no es responsable de la muerte . . . , y que la doctrina de *res ipsa loquitur* no es aplicable a dicha codemandada".

Nos dicen los apelantes que "en donde existe legislación requiriendo que por las compañías que dan servicio de electricidad, se hagan inspecciones o se verifique la corrección de

---

[3] Hubo prueba al efecto de que el terreno en los alrededores de las sillas estaba mojado.

las instalaciones antes de dar el servicio, como en Puerto Rico, no hay duda que el no cumplir con esos requisitos o cumplir negligentemente con los mismos, constituye negligencia que da base para una acción civil". Aluden aparentemente a la disposición transcrita en el escolio (2), de acuerdo con la cual, según se ha visto, "ninguna compañía de servicio público aprobará ni suministrará corriente eléctrica a ninguna instalación, reparación o trabajos eléctricos que no hubieren sido realizados por un perito electricista autorizado", y a que la instalación de las sillas voladoras fué hecha por uno de los apelantes que no era un perito de esa clase, y aprobada por un empleado de la Autoridad que tampoco lo era. [4]

La Autoridad ataca por inconstitucional el precepto legal invocado por los apelantes, sosteniendo que se refiere a peritos electricistas, un asunto no expresado en el título de la Ley núm. 13 de 2 de julio de 1923, según fuera enmendada en los años 1932 y 1935, ni en ninguna de las leyes modificándola. [5] Arguye además que de ser válido dicho precepto, y suponiendo, sin admitirlo, que hubiera sido negligente al aprobar la instalación eléctrica de las sillas voladoras, no podría atribuírsele responsabilidad alguna por no haberse pro-

[4] El empleado de la Autoridad que hizo la inspección, a base de la cual se aprobó la instalación, era hombre de experiencia, con varios años de servicio en inspecciones similares.

La prueba demostró que ni antes ni después del accidente, pudo encontrarse defecto alguno en las líneas de la Autoridad, o en la instalación eléctrica de las sillas. Ellas estuvieron funcionando normalmente, cuatro días antes del accidente, como hemos dicho, y siguieron usándose con posterioridad, sin entorpecimiento.

Después del accidente la Autoridad hizo una nueva inspección de sus líneas y de la instalación por medio de un perito electricista autorizado, sin que pudiera hallarse ningún defecto en ella.

[5] Cuando ocurrió el accidente y al iniciarse el litigio estaba en vigor la Carta Orgánica de 1917, el art. 34 de la cual, en parte, disponía que: ". . . No se aprobará ningún proyecto de ley con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título, pero si algún asunto que no está expresado en el título fuese incluído en cualquier ley, esa ley será nula solamente en aquella parte de ella que no haya sido expresada en el título . . .".

La Ley núm. 13 de 2 de julio de 1923, tenía el siguiente título: "Para Reglamentar el Funcionamiento y Manejo de Máquinas Cinematográficas y

bado la "relación de causa y efecto entre el daño . . . y el supuesto acto negligente".

No hay por qué resolver la cuestión constitucional que se plantea, ni necesidad alguna de enfrascarnos en una discusión de la imputación que le hacen los apelantes a la Autoridad en el sentido de que ésta violó el precepto legal que aquéllos invocan, toda vez que, como acertadamente afirma dicha Autoridad, no se presentó evidencia alguna para demostrar que la circunstancia de que ésta aprobara una instalación que no había sido hecha por un perito autorizado, fuera la causa directa y eficiente de la muerte, en otras palabras, en vista de la carencia absoluta de prueba relacionando la alegada infracción del precepto con el daño, *Maldonado* v. *Hamilton*, 32 D.P.R. 224; *Vélez* v. *Font*, 35 D.P.R. 312; *Pueblo* v. *Pereira*, 49 D.P.R. 891; *Miner, Read & Garrette* v. *McNamara et al.*, 72 Atl. 138 (Conn.); *Cary* v. *Los Angeles Ry. Co.*, 108 Pac. 682 (Cal.); *Lindsay et al.* v. *Cecchi*, 80 Atl. 523 (Del.).

■■ De acuerdo con el contrato formalizado con el dueño de las sillas voladoras el suministro de energía eléctrica por la Autoridad estaba sujeto a los términos y condiciones generales establecidos por la misma para esos servicios, figurando entre ellos el que "La Autoridad tendrá el derecho, pero no la obligación de inspeccionar las instalaciones eléctricas, pero el hecho de efectuar o no tal inspección o rechazar o no la instalación, no hará responsable a la Autoridad de cualquier pérdida, daño o accidente que resulte por defectos de instalación". Aseveran los apelantes que el contrato "no puede derrotar los propósitos de la legislación imperante", aludiendo de nuevo a la disposición legal que aparece transcrita en la nota (2).

Habiendo llegado a la conclusión de que no se demostró

---

Para Otros Fines". Así continuó el título hasta que por la Ley núm. 26 de 29 de agosto de 1950 (Leyes de 1950–51, pág. 97), se enmendó para leer como sigue: "Ley para Reglamentar el Funcionamiento y Manejo de Máquinas Cinematográficas y la Práctica de la Profesión de Electricista y para Crear una Junta Examinadora de Operadores de Máquinas Cinematográficas y Peritos Electricistas".

relación causal alguna entre la aprobación de la instalación por la Autoridad y el perjuicio causado, a nada práctico conduciría discutir la cuestión que se suscita, aunque conviene decir que generalmente una empresa distribuidora de energía eléctrica no puede abroquelarse en los pactos de un contrato, para eludir responsabilidad *por daños causados por ella, como consecuencia* de haber dejado de cumplir con normas establecidas por ley o reconocidas tradicionalmente por la jurisprudencia, como medidas necesarias para la seguridad y protección del público.

Estamos plenamente convencidos de que no se demostró que la muerte fuera consecuencia de un acto específico de negligencia, e igualmente lo estamos de que no incurrió en error la Sala de instancia al resolver que la doctrina de *res ipsa loquitur* no era aplicable a la Autoridad. La muerte ocurrió, repetimos, cuando el hijo de la demandante entraba en una de las sillas voladoras, de un artefacto que al igual que todo el equipo eléctrico utilizado para llevar a ellas la corriente, estaba bajo el absoluto dominio de los apelantes. Es cierto que aquélla suministraba la energía eléctrica en el lugar de entrega, pero sobre la que ocasionó la muerte en el sitio del accidente, "más allá del contador y ya circulando por la instalación" de los apelantes, no tenía control la Autoridad, y no se probó que ésta hubiera suplido corriente excesiva y peligrosa, ni que existiera conexión causal entre ella y el instrumento que ocasionó el daño. (⁶)

 En el cuarto apuntamiento señálase como error el que se resolviera "que tanto el demandado Hernán Aponte como el codemandado José María Aponte, uno como principal y el otro como su agente y empleado, vienen obligados a in-

---

(⁶) Tampoco puede presumirse negligencia causante de la muerte, por parte de la Autoridad, por el hecho de que ésta aprobara la instalación como lo hizo, entre otras razones, porque habiéndose demostrado que cuando empezó a suplir energía eléctrica la instalación estaba en condiciones de recibirla, sin que se probara que en ningún momento antes de ocurrir el accidente tuviera conocimiento la Autoridad de defecto alguno en dicha instalación, que hiciera inseguro continuar supliendo dicha energía, no hay base alguna para presunción de tal naturaleza.

demnizar a la demandante . . .". El señalamiento está desprovisto de méritos. Hay suficiente evidencia en los autos para sostener la conclusión de que los dos apelantes son responsables por los perjuicios sufridos por la actora.

En vista del análisis que hemos hecho de la prueba, es evidente que está también huérfana de méritos la contención de los apelantes—quinto apuntamiento—de que erró la Sala de instancia al apreciarla, declarando con lugar la demanda con respecto a ellos, tesis a que le presta su apoyo la demandante-apelada, al igual que lo hace con respecto a otras cuestiones suscitadas por los apelantes para sostener que debió dictarse sentencia contra la Autoridad.

█ Bajo el título de "Planteamientos Adicionales", solicita la demandante que reinstalemos la apelación que presentó contra la sentencia envuelta en este litigio, desestimada en el caso núm. 11,162 de este Tribunal—porque no se radicó la transcripción de evidencia—a solicitud de la Autoridad, por resolución de 8 de enero de 1954, ratificada en 28 de dicho mes y año, al denegar una moción de reconsideración, y que una vez reinstalada, dictemos la sentencia que a su juicio debió pronunciar la Sala de instancia, declarando con lugar la demanda en cuanto a todos los demandados, aumentando al mismo tiempo la cuantía de la indemnización y la de los honorarios. No podemos acceder a tales pretensiones.

*La sentencia apelada será confirmada.*