MODESTA RAMOS, por sí y como madre con patria potestad sobre su hijo menor ELENIO SANTIAGO, demandantes y recurrentes, *v.* LA AUTORIDAD DE FUENTES FLUVIALES DE PUERTO RICO, demandada y recurrida.

*Número:* 183    *Resuelto:* 30 de noviembre de 1962

604

*Felipe Marchand González,* abogado de los recurrentes; *José Antonio Arabía* y *Juan F. Dobal,* abogados de la recurrida.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

Un joven campesino de la montaña puertorriqueña sufrió graves lesiones al venir en contacto con un alambre de tierra que colgaba de un poste utilizado por la Autoridad de las Fuentes Fluviales para el tendido de sus líneas en el sector de Indiera Alta, de Maricao. Incoó demanda en reclamación de daños y perjuicios imputándole negligencia a la empresa mencionada consistente en que a) el alambre de tierra que bajaba por el poste "estaba viejo, desprendido del poste y fuera [del] sitio donde aparece que estuvo clavado y cuyos clavos estaban viejos, deteriorado [s] e inservible[s]; y, (b) ausencia de aviso al público de la condición peligrosa que representaban las líneas de alta tensión que discurrían por el lugar del accidente, a pesar de "las condiciones de edad, mal estado de conservación y negligente abandono" de las mismas.([1]) En su contestación, la parte demandada adujo

---

([1]) Como elemento de esta imputación de negligencia interpretamos que la prueba trató de establecer la falta de inspección adecuada para determinar la existencia de situaciones de peligro para el público.

como defensas que por la forma en que presta servicio—mediante cables y alambres tendidos por campos y ciudades, y aun dentro de propiedad privada—no le es posible mantener un control e inspección absolutos de tales líneas; que las líneas del lugar del accidente fueron instaladas y mantenidas de acuerdo a las normas de seguridad exigidas y recomendadas para tales casos; que el accidente fue fortuito e inevitable, o se debió a la negligencia o imprudencia temeraria del propio demandante, o a la actuación irresponsable o criminal de una tercera persona que cortó el alambre de referencia y creó una situación peligrosa que no pudo ser advertida ni remediada antes de la ocurrencia de los hechos por los cuales se reclama.

Al desestimar la demanda, el tribunal de instancia concluyó que la parte demandante no probó acto alguno de negligencia por parte de la empresa demandada y que no procedía establecer una presunción de negligencia mediante la aplicación de la regla de *res ipsa loquitur*, pues, si bien la cosa productora del daño se encontraba bajo el control exclusivo de la demandada y no podía sostenerse que los daños al demandante fueron consecuencia de la propia culpa o negligencia de éste, no era procedente sostener, por la forma en que ocurrió el accidente, que de ordinario no hubiera ocurrido a no ser que mediara negligencia de parte de los agentes o empleados de la demandada. Estas conclusiones de derecho se basaron en las determinaciones de hechos que se transcriben a continuación:

"1.—El día 4 de mayo de 1956, el demandante Elenio Santiago Ramos, quien para entonces contaba alrededor de 17 ó 18 años de edad, salió por la mañana de su hogar en el barrio Indiera Alta de Maricao y se dirigió a la finca cercana de don Ángel Nigaglioni, donde éste estaba trabajando para esa fecha en el desyerbo del café, habiendo el demandante atrechado por un camino dentro de la misma finca del Señor Nigaglioni que él y los demás obreros de la finca acostumbra-

ban utilizar con el aparente permiso del dueño para ir a su trabajo.

"2.—El atrecho antes mencionado pasaba como a 15 pies de un poste que sostenía una línea de corriente eléctrica de alta tensión propiedad de y bajo el control exclusivo de la Autoridad de Fuentes Fluviales de Puerto Rico, cuyas líneas cruzaban el camino en ese punto como a una altura de alrededor de 40 pies, según puede verse claramente en la fotografía que constituye el *exhibit L,* de la parte demandada, habiendo la Autoridad de Fuentes Fluviales instalado a lo largo de ese poste un cable de tierra de cobre clavado con grapas al poste a intervalos de 2 ó 3 pies para recoger las descargas eléctricas de rayos que pudiesen caer sobre esas líneas de alto voltaje [sic] en esa área.

"3.—El cable de tierra sobresalía por sobre el extremo superior del poste como un pie, según puede verse claramente en el *exhibit (B)* de la parte demandada, quedando el otro extremo de dicho cable enterrado al lado de la base del poste según puede observarse en el *exhibit (D)* de la parte demandada, con el propósito de llevar la corriente de cualquier rayo que cayese sobre esa línea directamente a tierra sin tocar las líneas de alta tensión sostenidas por el poste, cuyas líneas quedaban sostenidas en crucetas, separadas del poste y del cable de tierra a una distancia no menor de 3 pies.

"4.—Ese día 4 de mayo de 1956, al pasar el joven demandante Elenio Santiago por ese camino cercano a ese poste, se encontró con que ese cable de tierra se había partido cerca de la base del poste, desprendiéndose el mismo a todo lo largo del poste de la posición en que normalmente estaba dicho cable clavado con grapas, encontrándose la parte de abajo del cable colgando hacia afuera por sobre unas matas de guineo hasta la orilla del camino según puede verse en el trazado que hizo uno de los testigos de la demandada sobre la fotografía que constituye el *exhibit (H)* de la parte demandada,(¹) ((¹)Para la fecha en que ocurrió el accidente esa sepa [*sic*] de guineos aparentemente tenía matas que quedaban más cerca del camino.) quedando la punta inferior del cable un poco más abajo que la estatura del demandante. El cable de tierra estaba pegado al poste solamente de la parte superior del mismo, donde había una grapa que clavaba el cable al poste como a un pies [*sic*] de la punta del poste, estando en ese momento

el cable haciendo contacto con una de las líneas de alta tensión sostenidas por el poste.

"5.—Al ver la punta inferior del cable colgando a la orilla del camino, el demandante, sin pensar que ese cable pudiese estar cargado de corriente, agarró el cable con sus manos para quitarlo del camino, recibiendo el demandante en ese instante una fuerte descarga eléctrica que lo dejó casi sin conocimiento y que le ocasionó serias quemaduras en sus dos manos y en otras partes de su cuerpo que lo han dejado parcialmente inutilizado.

"6.—Ninguna de las partes presentó prueba de clase alguna para establecer la forma en que ese cable de tierra se había desprendido del sitio donde estaba clavado a lo largo de este poste, partiéndose cerca de su base, para ir a quedar colgando a la orilla de ese camino en la forma en que lo encontró ese día el demandante. La única prueba que da alguna luz en torno a ese detalle surgió del testimonio del Ingeniero Antonio Santiago, quien es el encargado de las líneas eléctricas de la Autoridad de Fuentes Fluviales en el Distrito de Mayagüez, quien manifestó que en ocasiones algunos de esos cables de tierra que han recibido descargas de rayos se han partido como consecuencia de la descarga, desprendiéndose del poste, habiendo indicado además dicho ingeniero que una descarga eléctrica de esa naturaleza podía tirar un cable de éstos hacia afuera para dejarlo en la posición en que quedó este cable de tierra cuando sufrió el accidente el demandante.([2])   (([2]) En realidad, es casi imposible pensar que ese cable hubiese quedado en esa posición debido a alguna otra causa.)

"7.—Tampoco hubo prueba de clase alguna sobre el tiempo que hacía que este cable estaba en esas condiciones al ocurrir este accidente, no habiéndose demostrado tampoco que la demandada tuviese conocimiento con anterioridad a la ocurrencia del accidente de la rotura de ese cable y del hecho de que el mismo se había desplegado [sic] del poste y que estaba haciendo contacto con las líneas de alta tensión, no habiéndose presentado tampoco evidencia de clase alguna para sostener la alegación del demandante de que el mencionado cable de tierra con que hizo contacto el demandante 'estaba viejo, desprendido del poste y fuera de su sitio' porque los clavos que lo aguantaban al poste estaban 'viejos, deteriorado[s] e inservible[s]'."

Expedimos auto para revisar la sentencia que declaró sin lugar la demanda. Los errores principales que se señalan se refieren a las dos conclusiones básicas de derecho del tribunal a quo al resolver que no se estableció acto alguno de negligencia de la demandada y sostener la inaplicabilidad de la doctrina de *res ipsa loquitur*. ■

1—Las personas o empresas que se dedican a generar y distribuir electricidad deben ejercitar el más alto grado de cuidado para evitar causar daño, atendido el carácter inherentemente peligroso de este elemento. Ahora bien, no tienen la responsabilidad de un asegurador, y por tanto, no responden en cualquier caso en que se cause un perjuicio, a menos que el daño haya sido producido por su culpa o negligencia al omitir desplegar un grado de cuidado en proporción al riesgo o peligro envuelto. *Matos v. P. R. Ry., Lt. & P. Co.,* 58 D.P.R. 160, 164 (1941) ; *Eastern Shore Public Service Co. v. Corbett,* 177 A.2d 701 (Md. 1962) ; *Richmond v. Florida Power & Light Co.,* 58 So.2d 687 (Fla. 1952) ; *Alabama Power Co. v. Berry,* 48 So.2d 231 (Ala. 1950) ; *Mintz v. Town of Murphy,* 69 S.E.2d 849 (N.C. 1952) ; Frumer, *Personal Injury,* vol. 3, pág. 536. Este grado de cuidado no se extiende únicamente a la instalación, mantenimiento y operación de la planta productora de la electricidad y las líneas que la conducen; incluye, además, la obligación de realizar una inspección adecuada para descubrir defectos y situaciones de peligro o riesgo para el público. *Duke Power Co. v. Mullinax,* 214 F.2d 431 (C.A. 4, 1954) ; *Hale v. Montana–Dakota Utilities Co.,* 192 F.2d 274 (C.A. 8, 1951) ; *Caraglio v. Frontier Power Co.,* 192 F.2d 175 (C.A. 10, 1951). ■

Precisamente como no se trata de una situación de responsabilidad absoluta, no es indispensable que se protejan las líneas en forma tal que se elimine toda posibilidad de causar daños; la obligación consiste en tomar aquellas precauciones que aseguren contra las probabilidades de riesgos y peligros, *Alabama Power Co. v. Berry,* 48 So.2d 231 (Ala. 1950) ;

*Rudd* v. *Public Service Co. of Oklahoma*, 126 F. Supp. 722 (Okla. 1954), y no se supone que se anticipe toda circunstancia fortuita que pueda resultar en causar perjuicios, *Stark* v. *Lehigh Foundries*, 130 A.2d 123 (Pa. 1957); *Perrine* v. *Pacific Gas and Electric Company*, 9 Cal. Rptr. 45, 49 (1960). Debe recordarse que tratándose de un servicio de primera necesidad, la distribución de la electricidad y fuerza eléctrica no debe impedirse requiriendo que se adopte toda la protección concebible por la mente humana a los fines de evitar riesgos no importa cuan imprevisibles sean éstos. El beneficio social que proporciona la electrificación no puede derrotarse mediante la exigencia de una responsabilidad absoluta.

El tribunal de instancia determinó, como cuestión de hecho, que el demandante no había establecido su alegación al efecto de que el alambre de tierra con el cual hizo contacto estuviera viejo y que los clavos que lo sujetaban al poste estuvieran deteriorados e inservibles. Esta apreciación está sostenida por la prueba, que, si algo revela, es que se trataba de una instalación reciente, hecha en 1952, o sea, cuatro años antes del accidente; que el alambre de tierra no presentaba señales de deterioro—según puede comprobarse por un examen de las fotografías admitidas en evidencia— y que había sido clavado con grapas a lo largo del poste; que dicho alambre había sido instalado a una distancia no menor de tres pies de las líneas de alta tensión para evitar contacto con éstas, siguiendo las normas de seguridad acostumbradas en estos casos. Además, surge claramente que, cuando menos, una semana antes de la ocurrencia del accidente, el alambre se encontraba en la posición original en que fuera instalado, sirviendo su propósito como pararrayos. ▆

Insiste el recurrente en que se demostró la negligencia de la Autoridad de Fuentes Fluviales consistente en su falta de inspeccionar periódicamente las instalaciones. Alude a la contestación de dicha demandada a un interrogatorio que le fuera notificado antes del juicio. La dificultad estriba en

que la contestación a que se refiere no fue ofrecida en evidencia y no podía considerarse por el tribunal a quo ni por este Tribunal en el presente recurso de revisión. *Autoridad de Fuentes Fluviales* v. *Corte*, 66 D.P.R. 844, 850 (1947). La única prueba que hay sobre este particular consiste en el testimonio de empleados de la demandada que declararon que realizaban inspecciones periódicas, consistentes en recorridos a pie cada tres meses. En cuanto a la obligación que tiene la demandada de inspeccionar sus líneas, precisa advertir que la misma no supone una vigilancia continua, o que le permita en todo momento estar informada sobre la condición de los alambres, *Jackiewicz* v. *United Illuminating Co.*, 138 A. 147 (Conn. 1927), y que, en ausencia de circunstancias especiales, la frecuencia de las inspecciones debe determinarse tomando en consideración la situación de las líneas, la posibilidad de que el público venga en contacto con las mismas, la clase de instalación y otros factores. Cfr. *Machuca* v. *Autoridad Fuentes Fluviales*, 66 D.P.R. 182 (1946). Por eso no puede exigirse el mismo grado de cuidado cuando se trata de alambres que discurren por vías públicas y líneas tendidas en la zona rural. El factor decisivo es la probabilidad de riesgos. En el presente caso se trata de líneas del servicio de electrificación rural, emplazadas en el corazón mismo de la montaña, lejos de vías públicas, en un lugar despoblado y remoto, y colocadas en forma tal que la probabilidad de riesgo para el público es mínima. No puede afirmarse que la labor de inspección que realizaba la Autoridad refleje que incurrió en negligencia. Cfr. *Roos* v. *Consumers Public Power District*, 106 N.W.2d 871 (Nebr. 1961); *Weissert* v. *City of Escanaba*, 299 N. W. 139 (Mich. 1941); *Morrison* v. *New York Telephone Co.*, 14 N.E.2d 785 (N.Y. 1938). Véase, Anotación, *Liability for injury or death from electrification of guy wire*, 55 A.L.R.2d 129 (1957).

Los actos de negligencia de la demandada a que se refieren las alegaciones no fueron establecidos por la prueba des-

filada. Esto no impide que invoque la doctrina de *res ipsa loquitur* para tratar de salvar del naufragio su causa de acción. *Martínez* v. *U.S. Casualty Co.,* 79 D.P.R. 596 (1956) ; *Rodríguez* v. *Aponte,* 78 D.P.R. 756 (1955) ; *Román* v. *Mueblería Central,* 72 D.P.R. 341 (1951) ; *The Effect of Specifc Allegations on the Application of Res Ipsa Loquitur,* 27 Fordhan L. Rev. 411 (1958), en donde se discuten extensamente las tres teorías sobre el particular.

2—Arguye el recurrente que el tribunal a quo incurrió en error al concluir que no había base para establecer una "presunción" de negligencia contra la demandada mediante la aplicación de la doctrina de *res ipsa loquitur.* Sostiene que dicha demandada no presentó prueba que tendiera a justificar que fue diligente y precavida para evitar el daño ocasionado.

Antes de considerar el error apuntado, conviene que precisemos el efecto procesal de la doctrina de *res ipsa loquitur,* que propiamente enfocada no es más que una manifestación de la evidencia circunstancial. Según expresan Harper y James en su obra *The Law of Torts,* vol. 2, § 19.11 págs. 1099 a 1104, se han elaborado tres reglas al respecto que coinciden en que, una vez se establece un caso en que la doctrina es aplicable, el demandante impide la desestimación de la acción a la terminación de la presentación de su prueba.(²) La regla adoptada por la mayoría de las jurisdicciones se conoce como la teoría de la "inferencia permisible,"(³) que en sustancia implica que: a) a la terminación de la presentación de evidencia por el demandante, la parte demandada no puede obtener la desestimación de la acción

---

(²) En la explicación de la regla que se hace en la opinión emitida en *Hermida* v. *Feliciano,* 62 D.P.R. 55, 59 (1943) se indica precisamente que el efecto de la aplicación de la doctrina es darle la oportunidad al demandante de que el juzgador considere la prueba y el posible conflicto que se plantee, si el demandado opta por presentar evidencia.

(³) Prosser W. L., *The Procedural Effect of Res Ipsa Loquitur,* 20 Minn. L. Rev. 241 (1936) ; Heckel y Harper, *Effect of the Doctrine of Res Ipsa Loquitur,* 22 Ill. L. Rev. 724 (1928).

mediante nonsuit; b) si la parte demandada decide no presentar evidencia, el demandante no tiene derecho a que se dicte sentencia a su favor a menos que la prueba prima facie sea de tal naturaleza convincente que la inferencia de negligencia que surge de la misma sea inevitable si no se controvierte por otra evidencia; c) si la parte demandada presenta evidencia tendente a explicar el accidente o a controvertir la inferencia de negligencia, no tiene derecho a que se dicte sentencia a su favor, a menos que sea de tal naturaleza convincente que una persona razonable no podría derivar una inferencia de negligencia al considerarla; y d) en ausencia de las situaciones (b) y (c)—que raras veces ocurren en la práctica—corresponde al juzgador determinar la cuestión de negligencia, guiado por las siguientes normas: 1) el demandante puede recobrar solamente en el caso de que la probabilidad de la existencia de negligencia del demandado sea mayor que la ausencia de la misma; 2) los hechos proporcionan una base para establecer la inferencia, lo cual autoriza, pero no obliga, a formular tal inferecia; y, 3) debe considerarse la explicación y refutación presentada por el demandado.

La segunda teoría reconoce en un caso de *res ipsa loquitur* el efecto de crear una presunción, en lugar de una inferencia.[4] de negligencia. La diferencia notable con la regla mayoritaria consiste en que si el demandado no presenta evidencia para controvertir la presunción, procedería dictar sentencia a favor del demandante, aunque la prueba no sea tan fuerte e inequívoca como se requiere para ello bajo la regla de la inferencia permisiva.[5] El efecto de la pre-

[4] Carpenter, *The Doctrine of Res Ipsa Loquitur*, 1 U. Chi. L. Rev. 519 (1934).

[5] La Ley de Evidencia define inferencia como "la deducción que de los hechos probados hace en su discernimiento el juez o jurado, sin que al efecto medie mandato expreso de la ley," y presunción como " la deducción que de determinados hechos, la ley dispone expresamente que se haga." Arts. 97 y 98 de la Ley de Evidencia, 32 L.P.R.A. secs. 1882 y 1883. Llanamente expresado, una presunción es mandatoria; la inferencia es permisible.

sunción no es transferir al demandado el peso de la prueba en el sentido de requerirle que presente evidencia de mayor peso o valor probatorio que la ofrecida por el demandante; es simplemente requerirle la presentación de prueba para evitar que se dicte sentencia a favor del demandante.

La tercer teoría en cuanto al efecto de la doctrina de *res ipsa loquitur* es que se traslada al demandado el peso de la prueba para persuadir al juzgador, mediante *la preponderancia de la evidencia,* de que el daño causado no obedeció a su negligencia. Frecuentemente esta teoría se aplica conjuntamente con la de la presunción de negligencia.([6])

Nos hemos extendido en estas consideraciones porque en el pasado hemos utilizado lenguaje en nuestras opiniones en que se hace alusión a las tres teorías anteriormente relacionadas lo que hace necesario esclarecer definitivamente la posición de este Tribunal respecto al efecto procesal de la doctrina de *res ipsa loquitur.* En *Matta* v. *Pueblo Super Market,* 80 D.P.R. 514 (1958), la más reciente expresión sobre el particular, dijimos a la pág. 517, que la regla "sólo crea una *inferencia rebatible* de negligencia que permite o autoriza la conclusión de que el accidente fue causado por la negligencia de la parte demandada, pero en ningún modo obliga al juez sentenciador a concluir que hubo negligencia." (Subrayado nuestro.) *Kirchberger* v. *Gover,* 76 D.P.R. 907, 912 (1954), alude indistintamente a la "inferencia" y a la "presunción" de negligencia que surge de la aplicación de la regla; *Cintrón* v. *A. Roig Sucrs.,* 74 D.P.R. 1028, 1036 (1953), señala que la doctrina que discutimos es "una regla de evidencia que equivale a una inferencia rebatible de negligencia bajo determinadas circunstancias," y añade que "como inferencia al fin, puede ser destruida por el demandado con prueba a tal efecto."

*Martínez* v. *U. S. Casualty Co.,* 79 D.P.R. 596, 603 (1956); *Rodríguez* v. *Aponte,* 78 D.P.R. 756, 761 (1955);

---

([6]) 31 Rocky Mt. L. Rev. 112 (1958).

*Román* v. *Mueblería Central*, 72 D.P.R. 341, 345 (1951);
*Rodríguez* v. *White Star Bus Line*, 54 D.P.R. 310 (1939) y
*Aldiba* v. *P. R. Railway, Lt. & P. Co.*, 41 D.P.R. 75, 79
(1930) se refieren al efecto de la doctrina como una presun-
ción de negligencia. Así, en *Román* v. *Mueblería Central*,
supra, se dice que "mientras el demandado no demuestre que
no fue por su negligencia que ocurrió el accidente, debe pre-
valecer en contra suya la presunción de negligencia que con-
lleva dicha doctrina." Y el traslado del peso de la prueba se
menciona en *Rodríguez* v. *Aponte*, supra; *Román* v. *Mueble-
ría Central*, supra, y *Hermida* v. *Feliciano*, 62 D.P.R. 55,
57 (1943). ■

Examinados nuestros casos en conjunto, la conclusión que
derivamos es que, independientemente de lapsos del lenguaje,
este Tribunal se ha adherido a la regla de mayoría que sus-
tenta como único efecto de la aplicación de la doctrina de *res
ipsa loquitur* el de establecer una inferencia permisible a
favor de la parte actora. ■

Admitido que el alcance de la doctrina de *res ipsa loquitur*
es establecer una inferencia de negligencia, examinemos los
requisitos que es necesario concurran para su aplicación:
(1) el accidente debe ser de tal naturaleza que ordinaria-
mente no ocurra en ausencia de negligencia de parte de al-
guna persona; (2) debe ser causado por una agencia o ins-
trumento dentro del control exclusivo del demandado;(7) y,
(3) no puede haber sucedido debido a acción voluntaria al-
guna o negligencia del demandante. *Cintrón* v. *A. Roig,
Sucrs.*, 74 D.P.R. 1028, 1036 (1953); *Hermida* v. *Feliciano*,
62 D.P.R. 55 (1943). En el caso de *Cintrón* señalamos
además que si de los hechos surge que hay alguna otra causa

---

(7) Hay situaciones especiales en que se ha aplicado la doctrina aun
cuando la cosa causante del daño no se encontraba bajo control exclusivo
del demandado. *Rinkel* v. *Lee's Plumbing & Heating Co.*, 99 N.W.2d 779
(Minn. 1959), y comentario en 59 Mich. L. Rev. 136 (1960). Véase, ade-
más, *Meaning of the Concept of Exclusive Control in Res Ipsa Loquitur
Cases.* 7 Buffalo L. Rev. 330 (1958). El ejemplo más frecuente es el de
la explosión de botellas.

probable del accidente de la cual pueda inferirse que no hubo negligencia y si la prueba es compatible con la probabilidad de la ausencia de responsabilidad no procedería aplicar la doctrina. Expresamos también que igual resultado se impone si los hechos dan lugar a dos inferencias en conflicto, una al efecto de que se ejercitó debido cuidado y otra de que hubo negligencia. Véase, 11 Syr. L. Rev. 74–75 (1959).

Conviene recordar que por el hecho de que el demandante no pueda explicar la causa del accidente necesariamente no procede aplicar la doctrina de *res ipsa loquitur*. Precisamente eso es lo que se pretende por la parte recurrente al indicar que basta con demostrar en su caso que ocurrió un accidente, que las líneas están bajo el control exclusivo de la empresa demandada y que el demandante no incurrió en negligencia alguna. Pero, como atinadamente observó el tribunal a quo, no puede sostenerse que el accidente por el cual se reclama, de ordinario, no hubiera ocurrido a no ser que mediara negligencia de los agentes o empleados de la demandada. Harper y James, *op. cit.*, pág. 1081, explican este requisito en la siguiente forma: "la cosa que causa el daño debe ser de tal naturaleza que su uso no causaría daño a menos que fuere negligentemente *construida, inspeccionada o utilizada*." Aceptado que las líneas e instalaciones no estaban deterioradas y que la inspección que se llevaba a cabo por los empleados de la demandada era suficiente bajo las circunstancias de este caso, ¿puede atribuirse negligencia por el desprendimiento de un alambre de tierra de cuyo hecho no se estableció tuvo conocimiento la demandada en tiempo para evitar la ocurrencia de daños? Además, según surge meridianamente de la prueba—especialmente de la interpretación de las fotografías ofrecidas en evidencia—era prácticamente imposible que extendiéndose el alambre y haciendo contacto con las líneas de alta tensión llegara a la vereda por donde supuestamente caminaba el demandante. Es bueno señalar

que el juzgador no dió crédito a la versión que ofreció el demandante sobre la forma en que sucedieron los hechos, y que en el curso del juicio manifestó que "es imposible que [el alambre] pegue al piso." Una vez descartada la indebida conservación de las líneas como causa productora del daño, por falta de prueba al efecto, el tribunal sólo tuvo ante sí las posibilidades que insinuó la prueba de la demandada, o sea, una, a la cual el juez se refiere en sus determinaciones, el desprendimiento del cable debido a la acción de un rayo, lo que lo colocaría en la esfera del caso fortuito; y, otra, el acto de una mano criminal que cortó el cable, bajo la cual tampoco sería responsable. *Sucn. Matheu* v. *Municipio*, 56 D.P.R. 539 (1940) es distinguible pues allí se trataba de un alambre de alta tensión que se rompió y cayó en una carretera pública, la ruptura no fué explicada de modo alguno consistente con la diligencia de la parte demandada y la prueba no estableció que ésta inspeccionara periódicamente sus líneas para cerciorarse de su estado. Véanse, además, *Orta* v. *P. R. Railway, Lt. & P. Co.*, 36 D.P.R. 743 (1927); *Rosado* v. *Ponce Railway Ltd. & P. Co.*, 18 D.P.R. 609, 632 (1912).

3—Un tercer error se señala por el recurrente afirmando que el tribunal concluyó que el alambre se partió debido a una descarga eléctrica sin que hubiera prueba de ese hecho. Mas, si se lee detenidamente lo resuelto, se observará que todo cuanto el juez manifiesta es que, no habiéndose probado en modo alguno la forma en que se desprendió el alambre de tierra, la explicación que estima más plausible es la de la ocurrencia de una descarga eléctrica.

*No habiéndose cometido los errores apuntados, se confirmará la sentencia dictada por el Tribunal Superior, Sala de Mayagüez, en 18 de junio de 1959.*