CONCEPCIÓN CINTRÓN Y ESTEBANÍA CASTRO, demandantes y apelantes *v.* ANTONIO ROIG, SUCESORES, S. EN C., demandada y apelada.

Número 10873.

*Sometido:* 8 de mayo de 1953. *Resuelto:* 29 de mayo de 1953.

*Bolívar Pagán,* abogado de los apelantes; *F. González, Jr.,* abogado de la apelada.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del tribunal.

El 3 de septiembre de 1952 la Sala de Humacao del Tribunal Superior de Puerto Rico dictó una sentencia declarando sin lugar una demanda de daños y perjuicios interpuesta por los apelantes contra Antonio Roig, Sucesores, S. en C.

En la demanda se alega que una máquina-tren perteneciente a la apelada arrolló al niño Isabelo Cintrón Castro, ocasionándole la muerte. El tribunal sentenciador formuló las siguientes conclusiones sobre los hechos:

"(1) Que el camino Guayanés que cruza del Aguacate a la playa es un camino público.

"(2) Que a una distancia de alrededor de un kilómetro hay otro camino que conduce a la finca 'Comuna' y que se le conoce como 'Camino de la Comuna'.

"(3) Que este camino de 'La Comuna' radica dentro de la propiedad privada de la demandada y a la fecha del accidente era utilizado para transitar vehículos de la demandada así como sus trabajadores y no se prohibía el paso por el mismo a las personas del vecindario.

"(4) Que el camino 'La Comuna' por su naturaleza, era a la fecha del accidente un camino privado carretero que era usado por el público.

"(5) Que para entrar en el camino de 'La Comuna' partiendo del camino Guayanés y en el sitio inmediato del accidente existía, a la fecha del mismo, un portón por el cual se daba acceso de uno a otro camino pasando por un pequeño predio propiedad de la demandada dedicado en épocas de zafra al arrimo de cañas de azúcar para su envagonamiento.

"(6) Que la máquina (locomotora) venía de la factoría (Central) con dirección a la finca Isleta arrastrando treinta y cinco (35) vagones vacíos para la dicha colonia Isleta.

"(7) Que el niño Isabelo Cintrón Castro tenía, a la fecha del accidente, nueve años, diez meses y diez y siete días de edad y era un niño inteligente y se encontraba asistiendo a la escuela.

"(8) Que el día 19 de mayo de 1949 Isabelo, el niño fallecido, andaba en unión de su hermano mayor Andrés Cintrón Castro en busca de un pasto que iba a cortar para unos conejos.

"(9) Que ambos niños habían penetrado en la finca de la demandada por la parte que da acceso del camino del Guayanés al camino de 'La Comuna' y sin que hubieran empezado a cortar

el pasto pasó en esos precisos momentos la máquina núm. 101 de la demandada conducida por Nicasio Jiménez Concepción arrastrando treinta y cinco (35) vagones en dirección de la playa y con destino a la finca Isleta.

"(10) Que el niño Isabelo Cintrón Castro al ver la máquina (el Tony) como él le decía se dirigió corriendo a la misma invitando a su hermano mayor a montarse en los vagones.

"(11) Que a pesar de que Andrés Cintrón Castro advirtió a su hermano menor que no se montase, éste, sin embargo, se montó en uno de los últimos vagones de atrás.

"(12) Que la máquina al momento de pasar por el sitio conocido por 'La Plaza' (sitio donde se echa la caña para envagonarla) no iba ligero.

"(13) Que aunque Andrés Cintrón Castro vió a su hermano menor montarse por el lado de uno de los vagones no vió lo que sucediera después.

"(14) Que el niño Isabelo Cintrón Castro fué encontrado muerto, decapitado, en la vía un poco más adelante del sitio donde se había montado.

"(15) Que el accidente ocurrió alrededor de las 2:30 de la tarde del día 19 de mayo de 1949.

"(16) Que el maquinista Nicasio Jiménez Concepción al regresar alrededor de media hora más tarde cargado con cañas vió el cadáver del niño en la vía y llamó para dar cuenta del accidente.

"(17) Que como entre treinta y sesenta minutos después se personó en el sitio de los hechos el cabo de la Policía Insular Vicente Ortiz Reyes procediendo a practicar una investigación preliminar.

"(18) Que no halló el Cabo Ortiz Reyes testigos presenciales del hecho con excepción de Andrés Cintrón Castro hermano del niño fallecido a quien condujo a presencia del fiscal del distrito Modesto Velázquez Flores.

"(19) Que Andrés Cintrón Castro, hermano del niño fallecido, prestó declaración ante el fiscal Modesto Velázquez Flores el día 20 de mayo de 1949 firmando de su puño y letra dicha declaración."

Los demandantes han apelado para ante este Tribunal y han señalado los siguientes errores:

"Primer error: El tribunal inferior cometió error al dictar sentencia contraria a la prueba, y al decidir que el niño Isabelo

Cintrón Castro incurrió en negligencia contribuyente, basándose el tribunal inferior únicamente en una declaración prestada por el otro niño Andrés Cintrón fuera del tribunal durante la investigación criminal del suceso por el fiscal.

"Segundo error: El tribunal inferior cometió error al no darle todo crédito a los dos únicos testigos presenciales del accidente, no contradichos, Juan Bautista Santiago y Tomás Ortiz.

"Tercer error: Aun en la hipótesis de que en ley no debiera darse crédito a los referidos únicos testigos presenciales del accidente, el tribunal inferior cometió error al no declarar con lugar la demanda aplicando, por los hechos y circunstancias del caso, la doctrina *res ipsa loquitur*."

■ Los demandantes presentaron como sus únicos dos testigos presenciales a Juan Bautista Santiago y Tomás Ortiz. Ellos expusieron, en síntesis, que la máquina era conducida a una velocidad excesiva, de 60 a 80 millas por hora; que el niño Isabelo Cintrón iba pasando por la vía para cruzar un camino, caminando de espaldas a la máquina; que el conductor no dió aviso alguno de su proximidad, y no tocó campana ni pito y le dió al niño, decapitándolo. El tribunal sentenciador indicó expresamente en su opinión que no le daba crédito alguno al testimonio de estos dos testigos, y señaló fundamentos específicos que demostraban que ese testimonio no era digno de crédito. Indicó, por ejemplo, el tribunal a quo, que en vista de la totalidad de la prueba y de la inspección ocular practicada por el tribunal, era completamente improbable e implausible el que la máquina particular envuelta en el caso pudiese caminar a la velocidad señalada por esos testigos en el sitio específico señalado por los testigos; que al hacerse una investigación policíaca en ese mismo sitio, como una hora después de ocurridos los hechos, los referidos dos testigos de los demandantes no estaban allí ni informaron en momento alguno que ellos eran testigos, ni persona alguna informó que esas dos personas habían presenciado el accidente; que ellos no declararon ante la Policía ni ante el Fiscal; que ellos declararon, al igual que se alega en la demanda, que el accidente ocurrió

el 23 de mayo de 1949 cuando realmente, y de acuerdo con evidencia objetiva y documental, el accidente ocurrió el 19 de mayo de ese mismo año y que uno de esos testigos, Juan Bautista Santiago, negó, en la repregunta formulada por la demandada, que él fuese pariente del niño fallecido, habiendo demostrado la prueba posteriormente que él era hermano de crianza de la madre del niño y que él vivía en la casa del niño, tal como lo admitió luego el propio Juan Bautista Santiago. Después de un detenido estudio de la totalidad de la prueba presentada y, especialmente del testimonio de los referidos dos testigos, hemos llegado a la conclusión de que no debemos dejar sin efecto la apreciación que de ese testimonio hizo el tribunal a quo. No cometió error manifiesto dicho tribunal al apreciar el testimonio de esos dos testigos, y, por lo tanto, no incurrió en error el tribunal en cuanto a este aspecto del caso.

■ Sin embargo, es definitivamente claro que el tribunal sentenciador erró al formular algunas de sus conclusiones de hechos a base de una declaración jurada del niño Andrés Cintrón, hermano de la víctima. Al día siguiente de los hechos Andrés Cintrón declaró al Fiscal de Humacao, en síntesis, que momentos antes de ocurrir el accidente él estaba con la víctima en el sitio de los hechos y que, a pesar de sus advertencias, su hermano subió a uno de los vagones del tren y luego fué encontrado decapitado. La demandada lo presentó como testigo y él declaró entonces que al ocurrir el accidente él estaba en su casa y no estaba con su hermano, no viendo el accidente, negando así lo que él había expuesto en su declaración jurada. La demandada, después de haber observado los trámites correspondientes, presentó en evidencia esa declaración jurada a los fines de impugnar la veracidad del testigo, y la corte la admitió. Luego el tribunal de Humacao formuló algunas de sus conclusiones sobre los hechos a base de lo expuesto por Andrés Cintrón en su declaración jurada y, sobre tal base, llegó a la conclusión de

que la actuación de la víctima al montar en uno de los vagones fué la causa del accidente, no siendo aplicable, por lo tanto, y según el tribunal a quo, la doctrina de *res ipsa loquitur*. Ahora bien, es indudable que la declaración jurada de Andrés Cintrón contenía manifestaciones inconsistentes con su declaración en corte, y que tal declaración jurada podía ser utilizada y considerada por el tribunal a los fines de impugnar, afectar o hacer desmerecer la credibilidad del testigo, pero lo expuesto en la declaración jurada no podía ser considerado como prueba independiente y positiva sobre los méritos del caso ni podía servir de base a conclusión alguna sobre hechos específicos. *Pueblo* v. *Colón*, 52 D.P.R. 413; *Pueblo* v. *Marchand Paz*, 53 D.P.R. 671; *Pueblo* v. *Pérez*, 43 D.P.R. 590; *Pueblo* v. *Lafontaine*, 43 D.P.R. 23; *Pueblo* v. *Rojas*, 16 D.P.R. 251. Aunque en Wigmore (Vol. 3, pág. 687, 688, sección 1018, 3ra. edición) se critica analíticamente tal regla, al ser aplicada a casos en que el testigo esté en corte, disponible para ser repreguntado, se reconoce, sin embargo, que esa es la regla general, a base del razonamiento de que, al presentarse dos versiones incompatibles del mismo testigo, este último tiene que haber faltado a la verdad en una de ellas. Es útil tal prueba a los fines de demostrar la repugnancia existente entre dos declaraciones. El hecho en sí de la repugnancia puede implicar falta de credibilidad de un testigo que está en conflicto consigo mismo, pero no significa que la versión anterior sea la verdadera. Tal como se indica en Wigmore, "sencillamente enfrentamos una declaración a la otra, percibimos que ambas no pueden ser correctas, e inmediatamente concluimos que el testigo ha incurrido en equivocación en una de ellas, pero sin determinar en cuál. Es la repugnancia y la inconsistencia lo que demuestra su error, y no la credibilidad superior de la declaración anterior. Así es que no aceptamos necesariamente su declaración anterior como sustituta de la actual; una meramente neutraliza a la otra como digna de credibilidad".

■ En este caso no hubo declaración de testigo otro alguno que expusiera la versión contenida en la declaración jurada de Andrés Cintrón.   Por lo tanto, carecen de base y de fundamento las conclusiones de hecho formuladas por el tribunal a quo en cuanto a que el niño que fué víctima del accidente subió o montó en uno de los vagones y, en cuanto a tal extremo, incurrió en error el tribunal.   Sin embargo, tal error no fué perjudicial y no justifica la revocación de la sentencia, que debe ser confirmada por otros fundamentos.   En primer término, ya hemos visto que el tribunal de Humacao no le impartió crédito alguno a la prueba de los demandantes y, por lo tanto, la parte demandante no sostuvo el peso de la prueba, y no estableció, con su prueba, caso alguno de negligencia y de responsabilidad de la parte demandada.   Además, prescindiendo de la prueba de los demandantes, y considerando la prueba en su integridad, la prueba de la demandada, creída por el tribunal a quo, demostró que no hubo negligencia ni responsabilidad alguna de parte de las demandadas.   Bajo esas circunstancias, las conclusiones de hechos del tribunal a quo en cuanto a lo expuesto por Andrés Cintrón en su declaración jurada, aunque erróneas, no producen revocación y deben ser consideradas como innecesarias para la resolución final del caso, y como superfluas (*surplusage*).   Una sentencia que puede ser sostenida por otros fundamentos no queda viciada por el hecho de que haya algunas conclusiones que no estén sostenidas por la prueba.   5 C.J.S. 1192, 1193; *Martinelli* v. *Luis*, 213 Cal. 183; *Smith* v. *Lightston*, 182 Cal. 41.

■ Un aspecto peculiar de este caso es al efecto de que el tribunal de Humacao resolvió que no era aplicable la doctrina de *res ipsa loquitur* porque existe en la prueba una explicación razonable de la causa del accidente, consistente, según el tribunal, en la negligencia contribuyente del niño al abordar uno de los vagones del tren en marcha.   Al así resolverlo, el tribunal descansó exclusivamente, en forma errónea, según ya hemos indicado, en la declaración jurada del niño

Andrés Cintrón. Por lo tanto, el fundamento expuesto por el juez sentenciador para declarar inaplicable la doctrina de *res ipsa loquitur* carece de virtualidad y se derrumba por falta de base en la prueba. No obstante ello, considerando la totalidad de prueba presentada, no se demostró negligencia alguna de parte de la demandada o sus agentes, ni es aplicable a este caso la referida doctrina de *res ipsa loquitur*. Veamos.

Prescindiendo de la prueba ofrecida por la parte demandante, por no haber sido creída por la corte, e ignorando la declaración jurada de Andrés Cintrón, por no poder servir como prueba independiente sobre los méritos del caso, queda en pie el testimonio de Nicasio Jiménez, conductor de la máquina y testigo de la demandada. Este testimonio fué creído por el tribunal a quo. Declaró que la máquina se movía bastante despacio, a una velocidad moderada, que él no vió al niño en momento alguno hasta el viaje de regreso de la máquina, en que vió al niño decapitado, sobre la vía, y que él nunca se percató de que hubiera choque o impacto alguno.

La doctrina de *res ipsa loquitur* es una regla de evidencia que equivale a una inferencia rebatible de negligencia bajo determinadas circunstancias; o sea, cuando concurren por lo menos tres requisitos: el accidente debe de ordinario no ocurrir a no ser por la negligencia de otra persona; debe causarlo una agencia o instrumentalidad dentro del control exclusivo del demandado; y no debe ocurrir debido a acción voluntaria alguna del demandante o a haber éste contribuído al mismo. *Hermida* v. *Feliciano,* 62 D.P.R. 55. Es una regla de evidencia que da derecho a la corte o a un jurado a inferir que ha existido negligencia en la ocurrencia de un accidente por la forma y circunstancias especiales en que éste ha ocurrido, y que, como inferencia al fin, puede ser destruída por el demandado con prueba a tal efecto. *Hermida* v. *Feliciano*, supra. Autoriza, pero no obliga, al juzgador a concluir que ha habido negligencia. *Hermida* v. *Feliciano*, supra; *González* v. *P. R. Ry., Light*, 34 D.P.R. 573; *Rodríguez* v. *White Star Bus Line*,

54 D.P.R. 310. Al prescindir de la prueba del demandante, surge de la declaración de Nicasio Jiménez que él conducía el tren a una velocidad moderada, tomando todas las precauciones del caso. Ello neutraliza y destruye cualquier posible inferencia de negligencia. Pero yendo más lejos aún, no hay margen en este caso para la aplicación de la doctrina *res ipsa loquitur*. Uno de los tres requisitos que ya hemos señalado se refiere a una situación en que la mayor probabilidad es al efecto de que el accidente fué causado por la negligencia de la parte demandada. Si los hechos y circunstancias del caso dan lugar a dos inferencias en conflicto, una al efecto de que se ejercitó un debido cuidado y otra, de que hubo negligencia, no es aplicable la doctrina. 38 Am. Jur. 1000. No es aplicable la doctrina si hay alguna otra causa probable de la cual pueda inferirse que no hubo negligencia (*Wilson* v. *Colonial Air Transport*, 180 N.E. 212), y especialmente no es aplicable si los hechos afirmativamente demuestran que no hubo negligencia. *Lejeune* v. *Collard*, 44 So.2d 504, 17 A.L.R. 2d 550 (La. App.). Específicamente en casos de accidentes de trenes, ya se ha resuelto que si la prueba es compatible con ausencia de negligencia, no surge presunción alguna. 75 C.J.S. 399; *Chicago, R. I. & P. R. Co.* v. *McClanahan*, 173 F.2d 833; *Martin* v. *Southern Pac. Co.*, 46 F.Supp. 957; *Indiana Harbor Belt R. Co.* v. *Jones*, 41 N.E.2d 361; *Risberg* v. *Duluth, Missabe & Iron Range Ry. Co.*, 47 N.W.2d 113.

En el caso de *Franklin* v. *M. K. & T. Ry. Co. of Texas*, 221 S.W.2d 918, 921, un objeto que se proyectaba de un tren le dió a un peatón que caminaba por el lado de la vía. Se resolvió que la negligencia no podía inferirse del hecho en sí del impacto, ya que la prueba no excluyó la probabilidad razonable de que la lesión hubiese sido causada por otra causa que no fuese la negligencia de la demandada.

Es importante el caso de *Puckhaber* v. *Southern Pacific Co.*, 132 Cal. 363, y ha sido comentado por los tratadistas. 60 Yale L. J. 761, 763, 764, "Legal Cause". Un tren mató

a un peatón, al moverse hacia atrás, habiéndose probado que no tenía las luces encendidas. Se resuelve que, aun asumiendo negligencia de parte de la demandada, no se estableció que esa negligencia fuese la causa del accidente, ya que, en ausencia de otra prueba, no se demostró lo que ocurrió al producirse el impacto, ni la forma y manera en que ocurrió el accidente, y lo ocurrido era compatible, por ejemplo, con la probabilidad de que el interfecto se hubiese lanzado súbitamente a la vía, indicándose que el hecho en sí de la muerte no daba lugar a la presunción de que la ausencia de luces hubiese sido la causa de la muerte.

En el caso de autos, no solamente hubo prueba creída por el tribunal a quo al efecto de que la máquina se movía despacio, a una velocidad moderada, sin que se hubiese realizado acto alguno negligente, sino que también el hecho en sí de que el niño fué encontrado muerto, decapitado, en la vía era compatible con la probabilidad de que la muerte no hubiese sido causada por negligencia alguna del conductor de la máquina. Era compatible, por ejemplo, con la probabilidad de que el niño se hubiese lanzado súbitamente en frente del tren, o que hubiese abordado, o subido a, uno de los vagones y se cayese del tren en forma negligente. Aunque el fundamento expresado por el tribunal a quo fué equivocado, no incurrió en error al resolver que la doctrina de *res ipsa loquitur* no era aplicable a este caso.

En el caso de *Sucesión Benn* v. *Sucrs. C. & J. Fantauzzi*, 33 D.P.R. 772, se resolvió que el dejar deslizar por una pendiente, en una noche obscura y lluviosa, un vagón de ferrocarril, dentro del cual había un tanque de petróleo, establece una presunción de negligencia en un caso de daños y perjuicios, siendo aplicable la doctrina de *res ipsa loquitur*. En *Román* v. *Mueblería Central*, 72 D.P.R. 341, un automóvil estacionado en una carretera ancha y recta fué chocado por otro vehículo, cayendo el primer carro estacionado sobre una persona que llevaba a cabo un cambio de gomas. Se resolvió que ello era suficiente prima facie para establecer que el acci-

dente no hubiera sucedido si no hubiera mediado negligencia por parte del chófer del vehículo que chocó dicho automóvil. Basta con exponer los hechos envueltos en esos dos casos para demostrar que ellos no son aplicables a las circunstancias de este caso.

El Tribunal Supremo de España, en su sentencia de 10 de julio de 1943, resuelve que si bien el criterio de la responsabilidad objetiva en los atropellos causados por automóviles no está consagrado en la legislación, esto no excluye que en los casos en que resulte evidente un hecho que por sí solo determine probabilidad de culpa, puede presumirse ésta. En el caso de autos el hecho en sí de haberse encontrado al niño muerto en la vía por sí solo no demostraba probabilidad de culpa. Es más aplicable la sentencia del mismo Tribunal de 12 de junio de 1900, en cuyo caso una persona que trataba de cruzar la vía fué matada por un tren, resolviéndose que no es suficiente para justificar una indemnización la existencia de una supuesta falta o negligencia, si no se acredita que ésta y no otra causa distinta dió lugar al daño y que, no habiéndose justificado el modo y circunstancias con que se realizó la muerte, no había responsabilidad.

El razonamiento que hemos adoptado en esta opinión en cuanto a la inaplicabilidad de la doctrina de *res ipsa loquitur* es el mismo adoptado por los comentaristas en estudios recientes sobre este problema. Véanse, el artículo del Profesor Seavey en 63 Harv. L. Rev. 643: "Res Ipsa Loquitur: Tabula in Naufragio"; Northwestern L. Rev., número de febrero de 1953, "Symposium Issue: The Law of Torts, Res Ipsa Loquitur", Vol. 47, pág. 847; Harper, *Readings in Torts*, Vol. 1, pág. 281; 30 Ill. L. Rev. 980; 35 Mich. L. Rev. 680; 22 Ill. L. Rev. 724; 22 Corn. L. Q. 39; 10 So. Calif. L. Rev. 166, 459, 467; 37 Cal. L. Rev. 183 Prosser: "Res Ipsa Loquitur in California".

*Debe confirmarse la sentencia apelada.*

El Juez Asociado Sr. Belaval concurre con el resultado.