RAFAEL ROMÁN MONTALVO, demandante y recurrido, *v.* JOSÉ DELGADO HERRERA Y MARYLAND CASUALTY COMPANY, demandados y recurrentes.

*Número:* R-62-272      *Resuelto:* 22 de noviembre de 1963

SENTENCIA de *F. Ramos Quirós*, J. (Arecibo) declarando con lugar una demanda en daños y perjuicios. *Revocada, declarándose otra, desestimando la demanda.*

*Rivera Zayas, Rivera Cestero & Rúa* y *Francisco Agraít Oliveras*, abogados de los recurrentes; *Gilberto R. Padró Díaz*, abogado del recurrido.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Ramírez Bages.

EL JUEZ ASOCIADO SEÑOR BLANCO LUGO emitió la opinión del Tribunal.

El día 3 de enero de 1957 el recurrido Rafael Román Montalvo sufrió graves lesiones mientras se encontraba realizando la inspección de un edificio en construcción dentro de las funciones del empleo que entonces desempeñaba como supervisor de construcción adscrito al Negociado de Permisos de la Junta de Planificación. El Fondo del Seguro del Estado practicó una investigación del accidente. Durante el curso de la misma se le tomaron declaraciones juradas al recurrido, en 20 de agosto de 1957, y a Flor Pérez Acosta, en 31 de julio de

1957. En 9 de mayo de 1958 dicho organismo determinó que se trataba de un accidente cubierto por la Ley de Compensaciones por Accidentes del Trabajo, le atribuyó una incapacidad total al lesionado y le concedió la compensación máxima de $3,500.00.

Es de significativa importancia la versión que ofrecieron Román y Pérez al ser entrevistados por los investigadores del Fondo del Seguro del Estado sobre las circunstancias que rodearon el accidente. Román expresó que "mientras iba a supervisar la obra de Barceló Marqués en la Ave. Llorens Torres fui a cruzar un muro de concreto el cual tenía unas cuentas varillas hacia arriba, entonces puse el pie derecho en las varillas y cuando fui a levantar el pie izquierdo había una varilla derecha, no sé cómo fue, pero perdí el balance por completo y al tratar de agarrarme de las varillas me fui hacia un lado y me rozó una varilla el lado izquierdo de las costillas, el hombro izquierdo, la pierna derecha, recibí un golpe debajo de la barbilla y los dedos de la pierna derecha sin el zapato romperse se lesionaron también, y los testículos. Sentí un ardor en la espalda. Me levanté, notaba algo raro en la espalda. Fui hasta el Fondo del Estado, me llenaron los papeles, estuve en tratamiento 29 días y me sacaron varias radiografías . . ." Flor Pérez Acosta, maestro de obras que dirigía la construcción del edificio que había ido a inspeccionar el recurrido, describió el suceso en forma suscinta: "Estaba inspeccionando unas varillas paradas para arriba y se safó [sic] y no se mató milagrosamente," y añadió que recibió lesiones con las varillas, "se raspó todas las manos y los costados."

En 29 de octubre de 1958, cinco meses y diez días después de la adjudicación del Fondo del Seguro del Estado, Román Montalvo acudió ante el Tribunal Superior, Sala de Arecibo, mediante demanda contra José Delgado Herrera y su aseguradora Maryland Casualty Co., en la cual expuso una versión completamente distinta de los hechos. En el hecho tercero de la demanda se dice que "mientras efectuaba la inspección antes

alegada y en ocasión en que cruzara una zanja o cuneta para una zapata, por sobre un tablón colocado sobre dicha zanja o cuneta a manera de puente, dicho tablón cedió al peso del demandante sufriendo éste una caída," y le atribuyó la responsabilidad civil al contratista demandado por su actuación negligente al proveer un puente o paso falso e inseguro sobre la zanja o cuneta mencionada.

La vista del caso fue señalada para el día 29 de diciembre de 1958. La parte demandada solicitó mediante moción de fecha 17 de diciembre la citación del Administrador del Fondo del Seguro del Estado para que compareciera y trajera al tribunal el expediente completo de la reclamación del demandante, número Iy-25261. Esta moción fue notificada al abogado del demandante, quien desde entonces estaba advertido de los propósitos de los recurrentes de utilizar dicho expediente.

Al asumir la representación profesional de los demandados, sus actuales abogados dirigieron en 5 de mayo de 1961 un interrogatorio a la parte actora, y entre otra información le requirieron para que relacionara el nombre y la dirección de los testigos que intentaba utilizar en la vista del caso. Cerca de tres meses transcurrieron antes de que el interrogatorio fuera contestado. Los testigos mencionados fueron el Dr. Nathan Rifkinson y don Flor Pérez Acosta, "más cualquier otra persona que investigaciones posteriores demuestren que tiene conocimiento de los hechos en controversia."

La vista se celebró finalmente en 9 de julio de 1962, cinco años y medio después de la ocurrencia del accidente. Al comenzar la misma tuvo lugar el siguiente incidente:

"Hon. Juez: . . . ¿Hay algún testigo presente que no haya sido informado en interrogatorios previos?

"Abogado Sr. Padró Díaz: Ninguno.

"Abogado Sr. Agraít Oliveras: Ninguno. (T.E. págs. 4–5.)

Inmediatamente la parte demandante comenzó la presentación de su prueba y llamó a la silla testifical a Adelino Mon-

talvo. El abogado señor Agraít se opuso a que se oyera este testimonio.

"Abogado Sr. Agraít Oliveras: Nos oponemos al testimonio de este testigo por cuanto a la parte demandante se le preguntó en el interrogatorio unido al expediente y este testigo que piensa declarar no está incluido entre los testigos que informó la parte demandante que iba a producir en apoyo de la demanda el día del juicio.

"Hon. Juez: Pregunté a los compañeros si había algún testigo presente que no fuera informado en los interrogatorios.

"Abogado Sr. Padró Díaz: Lo hicimos claro en la contestación los que íbamos a usar, más cualquiera otra persona que hubiera surgido después.

"Hon. Juez: ¿No hubo promesa de notificación?

"Abogado Sr. Padró Díaz: Ellos no objetaron.

"Abogado Sr. Agraít Oliveras: La contestación se hace el 31 de julio del 1961 y dice que son el Dr. N. Rifkinson, don Flor Pérez Acosta, más cualquier otra persona que investigaciones posteriores demuestren que tiene conocimientos de los hechos en controversia. Constituye la declaración de este testigo una sorpresa en el día de hoy puesto que no fue informado y el propósito de los interrogatorios a la parte demandante es obviamente conocer de antemano cuales son los testigos que van a declarar para ver qué relación existe entre él y el demandante. Tenemos derecho a investigar sobre el carácter de este ciudadano porque de otra manera estaríamos contrainterrogando de oficio.

"Hon. Juez: Entiende el tribunal que el compañero apela a las disposiciones de la regla sobre los interrogatorios para hacer esa objeción. Entiendo que igualmente tuvo la oportunidad de haber hecho objeción al interrogatorio y, desde luego, el tribunal no la estima como una contestación procedente a la pregunta que le hizo mas, sin embargo, en el ejercicio de su discreción el tribunal va a permitir el testimonio y le daremos el crédito que amerite. Adelante."

Conforme a la resolución del tribunal se recibió el testimonio de Montalvo, así como el de Flor Pérez Acosta y el propio demandante. Se admitió una certificación expedida por el Dr. Rifkinson. La parte demandada se limitó a presentar en

evidencia copias de las declaraciones presentadas por Pérez Acosta y Román en el curso de la investigación practicada por el Fondo del Seguro del Estado.

El tribunal de instancia dio crédito a la segunda versión ofrecida por la parte actora. En consecuencia declaró con lugar la demanda y condenó a la parte demandada a pagar la suma de $18,000 como indemnización y $2,000 para honorarios de abogado. No conforme con esta sentencia, se recurrió ante nos. Expedimos auto de revisión.

Se señala la comisión de seis errores, pero en vista de la conclusión a que hemos llegado sobre la procedencia de la revocación de la sentencia, nos limitaremos a discutir los dos apuntamientos que dan lugar a ello.

1—Se señala que el tribunal a quo incurrió en error al ignorar completamente la prueba de impugnación del testimonio de Flor Pérez Acosta y del demandante Román Montalvo. Para considerar este error es necesario hacer un breve recuento de las declaraciones de estos testigos durante la vista.

Flor Pérez Acosta atestó que llamó al demandante para que inspeccionara el acero que iba a fijar en el hormigón del edificio en construcción; que para ello tenía que pasar sobre un muro de alrededor de dos pies para llegar de la acera al edificio; que "había un tablón y tenía que pasar sobre el muro. Entonces, al poner un pie sobre el muro el tablón le falseó y entonces él se zafó y cayó sobre el muro de hormigón;" que Román *cayó sobre las varillas* y "se quedó balanceándose sobre las varillas que salían del muro;" que el tablón descansaba sobre el terreno; que el demandante resbaló en el tablón. Al inquirirse si había prestado una declaración jurada ante un funcionario del Fondo del Seguro del Estado, inicialmente negó que lo hubiera hecho; luego admitió la posibilidad y reconoció que debido al tiempo transcurrido estaba indeciso. Se le permitió la lectura de la declaración y confrontado con la omisión de mencionar el tablón, ofreció como explicación que "podría ser un olvido en ese momento pensando en el

momento en que *él estaba sobre las varillas que fue donde se cayó.*" Nuevamente describe el accidente afirmando que "Llega y pone el pie en el muro, perdió el balance y el tablón cedió." Acosado por el abogado de la parte demandada para que justificara la inexplicable ausencia en la declaración jurada de toda referencia a que el demandante había resbalado en el tablón, dijo finalmente: "Hay cosas que a uno se le olvidan y se confunde la mente y pasan inadvertidas."

El demandante declaró que iba caminando sobre un tablón y al extender el pie derecho para pararse sobre un muro, perdió el balance y se fue dentro de la excavación; que su cuerpo quedó descansando sobre el muro y los pies en la parte de la excavación; que no puede afirmar cuál fue la causa de la caída; que tenía la pierna derecha sobre el muro y el pie izquierdo sobre el tablón. Al mostrársele la declaración prestada ante el investigador del Fondo del Seguro del Estado, manifestó que no estaba seguro de haberla prestado, pero luego al confrontársele con el investigador Negrón, admitió que había declarado ante éste cuando estuvo recluido en el Professional Building. Luego, al suscitarse un incidente sobre la contradicción entre ambas declaraciones, el magistrado manifestó:

"Hon. Juez:  La corte ha oído su declaración hoy y la declaración leída por el compañero. En esa declaración anterior aparece que se refiere exclusivamente a no haber podido pasar unas varillas y el trastorno con las varillas, y ahora él habla de un tablón. Dijo que estaba pasando por ese tablón para treparse al muro. *Que explique en relación con esa declaración y el testimonio prestado hoy, esa diferencia, porque hoy dice que hay un tablón por el medio y un muro y que existe un tablón.*

P. Explique por qué no lo dijo en aquella oportunidad.

R. *A la fecha del accidente no recordaba con claridad las cosas en la oficina ni en mi casa ni en ningún sitio. Después que vine de la clínica le pregunté a don Flor que cómo me había pasado el accidente a mí.*" (Énfasis nuestro.)

Como puede determinarse por una detenida comparación de ambas declaraciones, la versión ofrecida ante el Fondo del Seguro del Estado no puede reconciliarse con la que se ofreció en el acto del juicio. Llama poderosamente la atención que a pesar de los detalles con que se le describió el accidente al investigador, la explicación que para la diferencia entre ambas se ofrece por el demandante es que "no recordaba con claridad las cosas en la oficina ni en mi casa ni en ningún sitio," y que dependía para prestar testimonio de la información que le suministrara un tercero—su propio testigo Flor Pérez Acosta. Este último, por su parte, se refugia en las debilidades de la memoria. ¿Pero es que podía recordar mejor los hechos cuando habían transcurrido cinco años y medio del accidente? Es innegable que según la primera declaración ninguna responsabilidad podía exigírsele a los demandados, (¹) pues conforme a la misma el accidente se debió a la imprudencia del propio demandante, mientras que la segunda versión —que introduce un nuevo elemento por la creación de un riesgo hasta entonces no mencionado—tiende a señalar a los demandados, cuando menos en parte, como interventores en la causa generadora del daño.

Consideradas todas las circunstancias no podemos aceptar que el tribunal de instancia acogiera la última versión a todas luces desacreditada y cuyos motivos eran fácilmente discernibles. Es más bien una cuestión de suficiencia de la prueba, de su calidad, que de apreciación. Pero si hubiera envuelto algún elemento de credibilidad de testigos, no vacilaríamos en sostener que el resultado a que llegó el juez a quo no es el más racional ni el más justo. La aquilatación de

(¹)Observamos, de paso, que de ser cierta la segunda versión contenida en la demanda, su ocultación en la investigación para los fines de determinar si se trataba de un accidente compensable, privó al Administrador de ejercitar su derecho a subrogarse para recobrar el importe de la compensación concedida al demandante y los gastos en que se incurrió para su tratamiento, según lo dispuesto en el Art. 31 de la Ley de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 32. *Negrón* v. *Comisión Industrial*, 76 D.P.R. 301 (1954).

prueba es la función más delicada que corresponde a un tribunal de hechos. Para ello debe poner a contribución su conocimiento de la vida diaria, y con fino escalpelo practicar la delicada intervención de separar los distintos elementos de la prueba y atribuirles su verdadero peso. Como dijimos en *Pueblo* v. *Luciano Arroyo*, 83 D.P.R. 573, 583 (1961), "los jueces no debemos, después de todo, ser tan inocentes como para creer declaraciones que nadie más creería."

■ Por otro lado, un detenido examen de esta segunda versión demostrará que es de dudosa validez factual. Probablemente le sería aplicable la doctrina de los hechos físicos incontrovertibles. Si el demandante tenía el pie derecho descansando en un muro, y su pie izquierdo resbala en un tablón colocado en falso al intentar pasar al muro, ¿cómo es posible que su cuerpo cayera hacia el frente sobre las varillas? Más aún, ¿cómo es posible que reciba lesiones con el roce de las varillas que sobresalían del muro? ¿No indican la naturaleza y el sitio de las lesiones que el demandante se encontraba sobre el muro y que lo que ocurrió fue que se zafó, como ambos atestiguaron en la primera oportunidad que tuvieron para describir el accidente? Aun en casos de prueba contradictoria hemos apuntado que la función de resolver conflictos en la declaración de testigos "no incluye el derecho a resolver que ocurrió lo físicamente imposible." *Matos* v. *Pabón*, 63 D.P.R. 890, 898 (1944).

2—El otro error se refiere a la admisión del testimonio de Adelino Montalvo que fuera oportunamente objetado por no haberse suministrado su nombre al contestar el interrogatorio que le fuera notificado al demandante. Ya precedentemente hemos reseñado los hechos sobre el particular.

■ Aun cuando la Regla 33 de las de Enjuiciamiento Civil de 1943 no proveía expresamente que una parte tenía derecho a solicitar y obtener los nombres y direcciones de los testigos de la parte actora, en *Autoridad de Fuentes Fluviales* v. *Corte*, 66 D.P.R. 844 (1947), así lo sostuvimos, al interpre-

tar conjuntamente sus disposiciones con las de la Regla 26 (b) y en consideración a su propósito como uno de los mecanismos proporcionados a las partes para el descubrimiento de prueba y la preparación para el acto del juicio. Es significativo que la parte pertinente de la Regla 26 (b) se refería a "la identidad y paradero donde puedan encontrarse personas que tengan conocimiento de hechos pertinentes." En la revisión de 1958, la Regla 30, relativa a interrogatorios, no sólo permite que se obtenga información sobre la identidad y dirección de las personas que puedan tener conocimiento de los hechos, sino que específicamente se permitió que se requiriera "una lista de los testigos que la parte interrogada espera utilizar en el juicio." *Discovery of Names of Trial Witnesses*, 21 F.R.S. 861 (1955) ; Moore's *Federal Practice* (2a. ed.), vol. 4, pág. 1077. Entre otras cosas así se facilita la toma de deposiciones a los testigos que efectivamente se intentan utilizar en el juicio y se proporciona la oportunidad para descubrir cualquier circunstancia que pueda utilizarse para desacreditar o impugnar su testimonio. De ahí la importancia que tiene que las contestaciones no sean evasivas, pues, como dijimos, en *Shell Co.* v. *Tribunal de Distrito*, 73 D.P.R. 451 (1952), el descubrimiento de prueba "está a mano para impedir que cualquiera de las partes litigantes pueda ocultar alguno de los hechos pertinentes hasta el día del juicio," ya que, como se dijo en *Hickman* v. *Taylor*, 329 U.S. 495, 507 (1947), "el conocimiento recíproco de los hechos pertinentes obtenido por las partes es esencial para una contienda judicial ordenada." Cf. *Four Brothers Corporation* v. *Cordero*, 277 F.2d 777 (1st Cir. 1960).

En *Peña* v. *Sucn. Blondet*, 72 D.P.R. 9, 13 (1951), una parte objetó que se permitiera declarar a varios testigos cuyos nombres no figuraban en la lista suministrada al contestarse un interrogatorio. No sostuvimos la imputación de error porque evidentemente con ello no se causó perjuicio alguno, pues, al intentarse ofrecer su testimonio el tribunal sólo accedió a que estos testigos dieran sus nombres y

direcciones y no permitió que declararan hasta varios días después, al continuar la vista del caso. Además, consideramos que en la contestación al interrogatorio se advertía de la existencia de los testigos aunque se hacía constar que por ser numerosos no podían ser identificados, y a pesar de estar aperibida, la parte que interesaba la información no solicitó antes del juicio que se le especificaran los nombres de estos testigos adicionales. Las circunstancias que concurren en el presente caso son claramente distintas. Al suscitarse el reparo a la admisión del testimonio de Adelino Montalvo, el tribunal no tomó la única medida que hubiera protegido a la parte recurrente; o sea, no permitir en ese momento que se introdujera el testimonio del testigo llamado sorpresivamente, sino que se limitó a invocar su discreción y a tratar el asunto como uno de credibilidad, criterio a todas luces erróneo. Por otro lado, la contestación al interrogatorio no había advertido a la parte recurrente de la existencia de otros testigos, sino que meramente se había indicado que se intentaba utilizar "cualquiera otra persona que investigaciones posteriores demuestren que tiene conocimiento de los hechos en controversia." Bajo tales circunstancias no correspondía a los demandados solicitar que se les especificaran los nombres de los testigos adicionales. Propiamente era obligación del demandante suministrar la información tan pronto tuvo conocimiento de la existencia del testigo, y con suficiente anticipación al juicio, para permitir a los demandados tomar las medidas apropiadas que estimaran necesarias. El más elemental sentido de lo que constituye una actuación limpia y leal (*fair play*) así lo demandaba. Moore, *op. cit.*, vol. 4, pág. 1080.

◼ Pero hay algo más. Los indicios que aparecen de la prueba señalan que en todo momento el demandante sabía de la existencia de este testigo. En la declaración que prestó en 20 de agosto de 1957—ocho meses después del accidente—al preguntársele "¿Qué testigos tiene usted del caso?" respondió: "Flor Pérez, el maestro de la obra, *y otros obreros*." El si-

guiente diálogo durante el testimonio del testigo Montalvo es sumamente revelador:

"P ¿Cuándo fue que el demandante o quién le dijo a usted que tenía que venir hoy aquí?

"R Ya hacia tiempo, desde la misma cosa de él, *que él estuvo en la clínica* [julio de 1957], lo había visto." (Énfasis nuestro.)

Barron y Holtzoff en *Federal Practice and Procedure* (1961), vol. 2A, sec. 777-1, págs. 388–389, comentan sobre la naturaleza continua de la obligación de contestar los interrogatorios—norma que expresamente adoptamos en la interpretación de la vigente Regla 30—en la siguiente forma:

"Frecuentemente ocurre que la contestación a un interrogatorio aunque completa y verídica según el mejor entender de la parte que la formula, se convierte en incompleta o desorientadora a la luz de información que posteriormente adquiere. ¿Está obligada a enmendar su contestación y dejar saber a la parte proponente del interrogatorio sobre esta nueva información?

"Los primeros casos parecen reconocer una obligación moral, pero esta solución no satisfacía las exigencias de la situación. Luego se reconoció que el tribunal, al requerir a una parte para que contestara un interrogatorio, podía disponer expresamente que la parte a quien se le dirige tenía la obligación continua de enmendar su contestación con vista a cualquier información nueva. Otras decisiones sostuvieron que la parte promovente podía lograrlo fraseando en ese sentido el requerimiento o preámbulo de los interrogatorios, aunque un tribunal le impuso la novedosa pero indeseable limitación de que ello era procedente únicamente en relación con aquellos interrogatorios que por su naturaleza requieren contestaciones continuas o cuando la información disponible en la conferencia preliminar no proporcionaba a la parte un término y oportunidad suficientes para preparar su caso.

"Finalmente, algunos tribunales adoptaron la posición más reciente y sostuvieron que aun cuando no se requiriera una contestación continua, bien por la parte proponente o por orden judicial, existía tal obligación continua de comunicar cualquier información adicional que se obtuviera. Este resultado es recomendable. Es intolerable permitir que una parte permanezca cruzada de brazos teniendo conocimiento que su contestación

anterior a un interrogatorio no es verídica a la luz de información más reciente. *Es inconsistente con el propósito de las reglas de evitar las sorpresas, y es inconsistente también con las normas de conducta que deben esperarse de una profesión docta y honorable.* La omisión de una parte de suministrar a la contraria la información adicional debe ser suficiente para impedir que declare un testigo no identificado, o para conceder una posposición, o conceder un nuevo juicio, según parezca justo." (Énfasis nuestro.)

■ Véanse, *Gebhard* v. *Niedzwieck*, 122 N.W.2d 110 (Minn. 1963); *Dempski* v. *Dempski*, 187 N.E.2d 734 (Ill. 1963); *D'Agostino* v. *Schaffer*, 133 A.2d 45 (N.J. 1957); *Abbatemarco* v. *Colton*, 106 A.2d 12 (N.J. 1954); *Smith* v. *Acadia Overseas Freighters, Ltd.*, 120 F.Supp. 192 (E.D. Pa. 1953); cf. *Fedors* v. *O'Brien*, 188 N.E.2d 739 (Ill. 1963); *The "Continuing" Nature of Discovery Techniques*, 42 Iowa L. Rev. 579 (1957). Resolvemos, por tanto, que el descubrimiento de la prueba que autorizan las reglas impone la obligación de justificar que las contestaciones son verídicas no sólo a la fecha en que se notifica la contestación, si que también a la de la vista del caso. ([2])

Como indicamos anteriormente ya desde los comienzos del pleito el demandante tenía conocimiento de la citación del Administrador del Fondo del Seguro del Estado con el expediente en el cual constaban las manifestaciones del demandante y su testigo Flor Pérez que presentaban una versión irreconciliable con los hechos alegados en la demanda. La impugnación por manifestaciones contradictorias anteriores podía anticiparse. Ésto provocó la necesidad de producir un testigo que no hubiese declarado en la investigación anterior.

---

([2]) Esta obligación se manifiesta aun más en el presente caso en que por estipulación de las partes suscrita después de la contestación a los interrogatorios se dispensó de la celebración de una conferencia preliminar. *Joseph Toker, Inc.* v. *Cohen*, 169 A.2d 838 (N.J. 1961).

Tampoco creemos que la disposición de la Regla 30 que no limita el número o grupo de interrogatorios que puedan notificarse impida la solución apuntada, pues obviamente tal precepto se refiere al propósito de permitir que se investigue sobre asuntos no cubiertos por anteriores interrogatorios.

Bajo las circunstancias discutidas procedía la exclusión del testimonio de Adelino Montalvo.

*Se revocará la sentencia dictada por el Tribunal Superior, Sala de Arecibo, en 18 de julio de 1962, y se desestimará la demanda.*