ELÍ RODRÍGUEZ RUIZ, ETC., demandantes y recurridos, *v.* AUTORIDAD DE ENERGÍA ELÉCTRICA y OTROS, demandados y recurrentes.

*Número:* RE-90-206          *Resuelto:* 8 de noviembre de 1990

*Ramón I. Ortiz Palmieri,* de *Parra, Del Valle, Frau & Limeres,* abogado de los recurrentes; los recurridos no comparecieron.

## RESOLUCIÓN

A la anterior solicitud de revisión, no ha lugar.

Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió voto disidente, al cual se unen los Jueces Asociados Señores Rebollo López y Andréu García.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

— O —

Voto disidente del Juez Asociado Señor Negrón García, al cual se unen los Jueces Asociados Señores Rebollo López y Andréu García.

La ardua misión de recrear la "verdad real" en el escenario judicial a menudo nos enfrenta a situaciones que generan en nuestro ánimo sensaciones de pena y tristeza y, sobre todo, compasión. Como jueces, gozamos de un enorme poder discrecional cuyo límite lo demarcan nuestras leyes y estamos obligados a velarlo con gran celo. No debemos abdicar nuestro deber de dispensar *justicia en derecho* en favor de una *justicia basada exclusivamente en sentimientos y pasiones.* Una dosis balanceada de ambos ingredientes es necesaria para lograr lo justo.

Así advertidos, procedamos a atender el presente recurso.

## I

En horas de la mañana del 25 del enero de 1987 se desató un incendio en una residencia sita en la Calle Libertad, Núm. 8 de San Germán, propiedad de Elí Rodríguez Ruiz y de su esposa Inés Jiménez Ortiz. Ésta, construida en madera techada de zinc, quedó prácticamente destruida, sufriendo el mayor daño en su parte posterior donde se encontraban los dormitorios. El siniestro, por su naturaleza y extensión, se propagó a la residencia contigua, perteneciente a María Petrola Toro Ayala, ocasionándole algunos daños menores.

A raíz de este suceso, el 20 de marzo de 1987 los perjudicados demandaron en el Tribunal Superior, Sala de Mayagüez, a la Autoridad de Energía Eléctrica (en adelante Autoridad) y su compañía aseguradora por los daños que, ocasionara el incendio. Alegaron, en esencia, que la Autoridad fue negligente al no proveerle el debido mantenimiento al tendido eléctrico del cual se servían las residencias afectadas, razón por la cual se originó el incendio.

Tras los procedimientos de rigor y un amplio período de descubrimiento de prueba, en el cual las partes tuvieron la oportunidad de oir la deposición de varios testigos y peritos, el tribunal de instancia acordó dividir la consideración del caso en dos (2) fases. Primero se dilucidaría el aspecto de la negligencia y responsabilidad de las demandadas y, de proceder, se determinaría en vista aparte el monto de los daños compensables. Así las cosas, se ventiló el proceso y el tribunal (Hon. Bárbara M. Sanfiorenzo Zaragoza, Juez) dictó sentencia parcial e impuso responsabilidad a la Autoridad y a su compañía aseguradora.

En revisión, la Autoridad nos solicita la revocación de ese dictamen aduciendo "ERROR MANIFIESTO DE HECHO Y DE DERECHO . . . AL AQUILATAR LA PRUEBA EN FORMA [ARBITRARIA]", y la "APLICA[CIÓN ERRADA DE] LA DOCTRINA DE *RES IPSA LOQUITUR*" al caso. Petición

de revisión, pág. 3. Ante tales planteamientos, procede una relación de la prueba presentada. Sólo así podremos apreciar la cuestión en su justa perspectiva. Veamos.

## II

Los demandantes pretendieron demostrar la negligencia de la Autoridad a través de los testimonios de Edna Morales Ortiz, Erick Sáez, Milagros y Zaida Vázquez, y del perito electricista Rubén D. Reyes, entre otros.

La señora Morales Ortiz y el señor Sáez atestaron, en lo pertinente, que aproximadamente una semana antes del siniestro escucharon un zumbido fuerte proveniente del poste del tendido eléctrico de donde partían las tomas que suplían el servicio a las residencias afectadas.(1) Además, la señora Morales Ortiz declaró que durante los dos (2) años que llevaba residiendo en la Calle Libertad nunca se le dio mantenimiento alguno al alambrado del servicio de energía eléctrica, encontrándose éste deteriorado. Igualmente, señaló que el 27 de enero de 1987, tras escuchar un ruido fuera de lo común, salió fuera de su residencia y se percató del incendio en la residencia de Elí Rodríguez Ruiz, interrumpiéndose en esos instantes el servicio eléctrico.

Por su parte, tanto Milagros como Zaida Vázquez narraron cómo en la mañana del 25 de enero de 1987, tras percibir un olor "a goma quemada", salieron a la calle y observaron que salía del poste del tendido eléctrico una *chispa de fuego* que corrió por la toma hasta llegar a la casa de Rodríguez Ruiz. Tan pronto la *chispa de fuego* llegó a la casa, ésta, sostuvieron, comenzó a arder en llamas. Acto seguido, la toma se desprendió de la estructura. Posteriormente, personal de la Autoridad la enrolló y colgó del poste.

El perito electricista Reyes visitó la residencia de Rodríguez Ruiz el 11 de noviembre de 1987 —*unos diez (10) meses luego de*

---

(1) Como señalamos adelante, la Autoridad de Energía Eléctrica presentó prueba a los efectos de demostrar que este zumbido provenía de la luminaria de mercurio que había en el poste. Esta fue reemplazada por una de sodio, precisamente *una semana antes del siniestro*.

*ocurrido el incendio*— y determinó que el incendio se debió a desperfectos en la toma eléctrica que le servía, lo que ocasionó una fuga de corriente a tierra. Adujo que, por no tener instalado el fusible adecuado, el transformador no tumbó a tiempo, por lo que se calentó la línea y se derritió la aislación del cable de la toma. Al caer la aislación derretida sobre la madera de la casa de Rodríguez Ruiz, se inició el incendio. Arribó a esta conclusión, según admitió en el contrainterrogatorio, *sin haber inspeccionado* la toma que servía a la residencia de Rodríguez Ruiz. Con esta prueba y teoría sometieron su caso los demandantes.

En su turno, la Autoridad presentó prueba en contrario para demostrar su diligencia en el mantenimiento de las líneas de servicio y de que el incendio se originó *dentro de la estructura.*

En primer término, estableció que para el 18 de enero de 1987 se reemplazó la luminaria de mercurio de ciento setenta y cinco (175) vatios utilizada en el sistema de alumbrado instalado en el poste frente a la residencia de la señora Morales Ortiz. Para eliminar el ruido producto de la vibración que producía ésta, se instaló una luminaria de sodio de setenta (70) vatios.

El Sr. Carlos Cordero, supervisor de la Autoridad con más de veintitrés (23) años de experiencia, atestó que para enero de 1986 —*un (1) año antes del incendio*— fue reemplazado *todo el sistema de servicio eléctrico de la Calle Libertad.* Ello fue motivado al percatarse del estado en que se encontraba el tendido eléctrico en ocasión de prestar servicio a una residencia nueva de esa calle. La Autoridad cambió las líneas secundarias y las tomas que servían a las residencias, *incluso la de los demandantes.*(2) Señaló el señor Cordero que para el reemplazo de las tomas se utilizó una línea de aluminio de tres (3) hilos trenzados con cobertura de aislación de polietileno *no inflamable* en los alambres positivos, distinto del existente de tres (3) hilos individuales de cobre. Sobre este aspecto, el perito Ing. Faustino Rivera declaró que el referido material aislante utilizado estaba diseñado

---

(2) La única toma que no fue reemplazada fue la de una residencia situada al final de dicha calle, que era de reciente instalación.

para resistir altas temperaturas y, de estar expuesto a éstas por largos períodos de tiempo, se desintegraría.

Declaró además el ingeniero Rivera —haciendo referencia y avalado en literatura científica— que el transformador de cincuenta (50) Kva. de capacidad que servía a las residencias afectadas estaba equipado con fusibles de veinticinco (25) amperes, según especificado. Añadió que el día del incendio, según lo esperado, éste funcionó y suspendió el servicio eléctrico al detectar una anomalía en las líneas. Por su parte, el Sr. José Almodóvar, empleado de la Autoridad, atestó que este transformador era suficiente y adecuado para el área, demostrándolo así un estudio de carga que realizara.

Finalmente, declaró el Ing. Miguel Carbuccia, perito en fuegos de la Autoridad. Tras haber visitado el área afectada el 9 de abril, el 13 de mayo y el 5 de junio de 1987 para estudiar el origen y la naturaleza del fuego, determinó que aun cuando desconocía su causa específica, no tenía dudas de que el foco de origen se encontraba en el interior de la residencia de Rodríguez Ruiz. Ello resultaba evidente, según declaró, por la forma en que se desarrolló el incendio y por la condición y circunstancias de los escombros.

Durante estos procedimientos ambas partes, separada y conjuntamente, presentaron numerosas fotografías que mostraban el área afectada. Éstas, coetáneas y posteriores al incendio, son sumamente reveladoras pues, como sabemos, "es regla auxiliadora en el proceso evaluativo de formar conciencia judicial de hechos, el análisis de perspectiva integral de la prueba, atribuyéndole mayor valor probatorio a la evidencia aportada que contiene la característica de garantía circunstancial de veracidad entre las cuales se destaca la que posee ingredientes de espontaneidad y contemporaneidad con el suceso. Las muchas dudas que surgen con respecto a la credibilidad que merece un testigo o a la posibilidad de que su relato sea lo más cercano y probable a la realidad extrajudicial ya pasada, son susceptibles de ser salvadas y esclarecidas mediante este enfoque". *García v. A.F.F.*, 103 D.P.R. 356, 358 (1975).

Los *exhibits* de la demandante identificados de II-A a II-O, consistentes en varias fotografías tomadas *durante* el incendio por el Sr. Sebastián Marchand, tienden a confirmar la teoría de la Autoridad. A la vez, desmienten las declaraciones de Milagros y Zaida Vázquez. Esas fotografías muestran que durante el incendio la toma que bajaba del poste a la casa de Rodríguez Ruiz no fue afectada —por el contrario, ésta se encontraba en buenas condiciones— y que el incendio sólo afectó levemente el frente de la estructura en comparación con su parte trasera. Como cuestión de hecho, la toma nunca se desprendió de la estructura por sí sola y fue el Sr. Carlos Santana, empleado de la Autoridad, quien la desconectó.

De igual forma, los *exhibits* III-G, III-H y III-I de la demandada son reveladores y de gran interés. Estos muestran el área donde se encontraba el punto de entrega del servicio eléctrico y el contador. Resulta evidente allí la presencia de pocas y superficiales grietas, o huellas de cocodrilo, en la madera, lo cual tiende a indicar que éste no es el punto de origen del incendio. Y es que el "fuego que envuelve una viga de madera tiende a redondear las esquinas del lado más lejano de la fuente de la flama. La superficie de una madera carbonizada experimenta un patrón de grietas que en apariencia es similar a la piel de un cocodrilo. El punto probable de origen es aquel sitio donde están las marcas más pequeñas del 'patrón de cocodrilo' y se encuentran las más profundas. Así, un investigador al acercarse más al punto de origen, encontrará que la carbonización es más profunda y los segmentos de 'huellas de cocodrilo' se convierten en más pequeñas". (Traducción nuestra.) C.E. O'Hara, *Fundamentals of Criminal Investigation*, 7ma ed., Illinois, Ed. C.C. Thomas, 1967, págs. 205–206. Véase, además, *Arson and Arson Investigation*, Nat. Inst. of Law Enforcement and Criminal Justice 77 (Oct. 1977), págs. 87–88 (citado con aprobación en *Pueblo v. Cruz Granados*, 116 D.P.R. 3 (1984), opinión concurrente). Similar conclusión sugieren otras tantas fotografías. Éstas muestran la sección posterior de la residencia de Rodríguez Ruiz totalmente destruida, concentrándose la mayor destrucción en las habitacio-

nes ubicadas detrás de la casa. *Exhibits* de la demandada III-K, III-L, III-LL, III-N y III-R.

Al comparar las fotografías exteriores de la residencia con las interiores, nos percatamos de un detalle que salta a la vista. Mientras que en el interior hay "huellas de cocodrilo" por doquier, el exterior se distingue por la casi total ausencia de este patrón. Conclusión inevitable resulta determinar que, con mayor probabilidad, el fuego se originó dentro de la estructura y se esparció hacia el exterior.

Ante este inescapable marco fáctico, procedamos a analizar las conclusiones a que llegara el ilustrado foro sentenciador.

## III

El tribunal de instancia concedió credibilidad sólo a la prueba presentada por los demandantes y entre otros aspectos determinó que:

a. La casa comenzó a quemarse rápidamente *por el frente*. (Determinación de Hecho Núm. 4).

b. El cable por donde corrió el fuego *se desprendió de la casa.* (*Íd.*)

c. El transformador de 50 Kva. que servía al área en cuestión estaba equipado con *un fusible mayor al adecuado*, ello evitó que éste interrumpiera el servicio a tiempo por lo que "[l]as líneas se calentaron de tal forma que se incendió el cable que suplía energía a Don Elí, corriendo el fuego por el mismo hasta la casa". (Determinación de Hecho Núm. 8).

d. La prueba pericial, los testimonios, las fotos y la prueba documental establecen que el fuego fue causado por el cable que suplía electricidad a la residencia de Don Elí y que el punto de ignición lo fue (sic) en la conexión del cable con la casa. (Determinación de Hecho Núm. 10). Sentencia parcial, Apéndice 3, págs. 13, 15 y 16.

En consecuencia, concluyó que la Autoridad era responsable del incendio ocurrido al ser negligente en la "inspección, mantenimiento y supervisión de las líneas y demás equipo eléctrico conociendo [. . .] que el sistema eléctrico del área en controversia

492

databa de cuarenta (40) años". (Determinación de Hecho Núm. 12). Sentencia parcial, Apéndice 3, págs. 13, 15 y 16.

No podemos convenir con el ilustrado foro de instancia. "Conflictos irreconciliables con las versiones de los testigos presentados por los reclamantes, en unión a la regla de hechos físicamente improbable o imposible —que constituye una de las excepciones a la norma de abstención judicial apelativa en cuanto a las determinaciones de hecho consignadas por los tribúnales de primera instancia— nos llevan a la anterior conclusión. *Burgos Quiñones v. A.F.F.*, 90 D.P.R. 613, 620–621 (1964); *Román Delgado v. Delgado Herrero*, 89 D.P.R. 428, 437 (1963)." *García v. A.F.F.*, supra, pág. 360.

## IV

La prueba testifical y demostrativa no contradicha presentada por la Autoridad revela concluyentemente que el incendio no se originó ni se propagó como determinara el tribunal de instancia.

Primeramente, las fotografías muestran el cable de la toma eléctrica *intacto*, esto es, con su cubierta aislante en buen estado. Mientras el fuego consumió la parte posterior de la estructura, dicho cable continuó en todo momento conectado a los bolillos receptores del punto de entrega. De igual forma, el poste de donde provenía la toma no mostraba daño o quemadura alguna que evidenciara la *chispa de fuego* que alegadamente bajó del poste a la casa. Esta situación, fácilmente constatable mediante evidencia demostrativa directa, se hace más evidente ante el hecho de que el material transmisor de la toma era aluminio. Este metal, como declarara el ingeniero Rivera, tiene un punto de fusión sumamente bajo, y de haber estado expuesto al fuego se hubiera derretido.[3] *Ello hace físicamente improbable, si no imposible, la teoría de la parte demandante, la cual adoptara el*

---

[3] Mientras que el punto de fusión del aluminio es de unos 1219°F (660°C), la mayoría de los incendios alcanzan temperaturas de 600° a 1500°F de tres (3) a seis (6) pies sobre el suelo y de 1000° a 2000°F de seis (6) pies en adelante. A estas temperaturas se da fácilmente la fusión del aluminio. R.A. Yereance, *Electrical Fire Analysis*, Illinois, Ed. C.C. Thomas, 1987, págs. 19 y 144.

*tribunal de instancia.* Conjuntamente, la cobertura aislante de polietileno de la toma era no inflamable, lo que descarta su ignición.(4)

Asimismo, las fotografías muestran que la mayor destrucción del incendio se centró alrededor de la parte posterior de la estructura. Allí notamos cómo los patrones de "huellas de cocodrilo" fueron más intensos y profundos en la madera. Estos hechos tienden a demostrar la razonabilidad de la posición de la Autoridad. Como declarara el perito en incendios, ingeniero Carbuccia, la génesis del incendio fue en el interior de la residencia, específicamente en el área de los dormitorios en su parte posterior.

Advertimos, además, la incompatibilidad de la prueba testifical presentada por los demandantes frente a la realidad que muestran las fotografías que ellos mismos y la Autoridad presentaron. Similarmente, la credibilidad de la señora Morales Ortiz, testigo de los demandantes, quedó en tela de juicio al atestar que nunca se le había dado mantenimiento al sistema de servicio eléctrico del área. El testimonio no contradicho del señor Cordero demostró que en enero de 1986 todas las líneas secundarias y prácticamente todas las tomas del área fueron reemplazadas. A pesar de estos hechos establecidos por la Autoridad mediante prueba pericial y evidencia directa, el tribunal de instancia no la consideró. Aún más, se negó a hacer determinaciones de hecho adicionales requeridas, a pesar de estar justificadas por evidencia no contradicha.

En resumen, la Autoridad demostró la improbabilidad, o imposibilidad, de que el incendio comenzara en el poste. Por el contrario, estableció que su origen fue *dentro* de la residencia de Rodríguez Ruiz, específicamente en uno de los dormitorios posteriores. Ante esta situación fáctica, es improcedente

---

(4) "Cuando los hechos físicos o materias de conocimiento general apuntan tan certeramente a la verdad que no dejan margen para determinaciones contrarias, basadas en la razón y el sentido común, estos hechos físicos y probabilidades razonables, no son afectados por testimonio prestado bajo juramento que, en meras palabras, los contradicen. (Citas omitidas.) *Burgos Quiñones v. Autoridad de Fuentes Fluviales,* 90 D.P.R. 613, 620-621 (1964).

responsabilizarla por el incendio ocurrido, aun bajo la aplicación de la doctrina de *res ipsa loquitur*. Para activar esta inferencia es menester que el incendio se origine en un área bajo el control exclusivo de la parte demandada. Tal no es el caso de autos. *Martínez Mattei v. Montañez*, 98 D.P.R. 726, 730 (1970); *Ramos v. Autoridad de Fuentes Fluviales*, 86 D.P.R. 603, 612 (1962); *Cintrón v. A. Roig, Sucrs.*, 74 D.P.R. 1028, 1036 (1953); *Hermida v. Feliciano*, 62 D.P.R. 55 (1943).

La ausencia de los elementos de actos negligentes por parte de la Autoridad y de nexo causal con los daños alegados, debieron movernos a expedir el auto y revocar la sentencia parcial del Tribunal Superior, Sala de Mayagüez, declarando sin lugar la demanda. Sólo así hacemos cumplida justicia.